IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 90-8725

---

GLORIA GONZALEZ, Individually and as
Next Friends of JESSICA GONZALEZ, and
VICTOR GONZALEZ, Individually and as
Next Friends of JESSICA GONZALEZ,

Plaintiffs-Appellees,

versus

YSLETA INDEPENDENT SCHOOL DISTRICT,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Western District of Texas

---

( July 20, 1993 )

Before HIGGINBOTHAM and DUHÉ, Circuit Judges, and HUNTER[*], District Judge.

HIGGINBOTHAM, Circuit Judge:

This appeal raises difficult questions of law in a difficult, tragic setting. Jessica Gonzalez was sexually molested by Andres Mares, her first grade teacher, while attending one of the elementary schools within the Ysleta Independent School District. After Jessica's parents, Gloria and Victor Gonzalez, discovered that the YISD Board of Trustees had elected to keep Mares in the classroom in the face of similar allegations of sexual abuse two years earlier, they brought this § 1983 action against the school district in the U.S. District Court for the Western District of

---

[*]Senior District Judge of the Western District of Louisiana, sitting by designation.

Texas. The case went to the jury on the claim that the district policy regarding sexual abuse was a legal cause of the denial of Jessica's constitutional right to bodily security. The verdict was $500,000.

On appeal, YISD contends that the district court should have instructed the jury that the school district could be held liable under § 1983 only if the Board's failure to relieve Mares of his teaching duties manifested a deliberate indifference to the constitutional rights of students. The school district also submits that the trial evidence is insufficient to support a finding of liability under this heightened standard of fault. We agree and, finding that the second claim requires reversal, we reverse and render judgment in favor of the school district.

I.

Ysleta Independent School District is the seventh-largest in Texas, educating over 50,000 students. Prior to 1984, YISD had no formal policy regarding sexual abuse of students by teachers; the issue was instead left to the discretion of the individual school principals. In 1984, YISD adopted a written policy incorporating provisions of the Texas Family Law Code. In accordance with Texas law, the policy provided that "any person(s) who suspects that a child's physical or mental health or welfare has been, or may be, adversely affected by abuse or neglect . . . must report his or her suspicions to the Texas Department of Human Resources and/or to a law enforcement agency." The primary responsibility for contacting the Department for Human Resources remained with the school

2

principal, who was charged with making an oral report "without delay" and a written report within five days.[1] The results of the operation of this policy were fairly uniform: With one exception, every complaint of abuse from 1983 to 1987 led to the permanent removal of the teacher in question from any contact with school children.[2]

The exception to this otherwise unbroken pattern of teacher removal was Andres Mares, the man who molested Jessica Gonzalez. Mares' penchant for inappropriate conduct with his young female students first surfaced in 1981. He was at that time a Spanish teacher at the Ascarate Elementary School. In November 1981, Nellie Morales, Principal of Ascarate, received a complaint from the parent of one of his students. The parent informed Principal Morales that Mares frequently allowed girls to sit on his lap during class, a practice the parent and Morales considered highly improper. After consulting Rudy Resendez, Assistant Superintendent for Elementary Schools, Morales responded to this report with an

---

[1] Despite the apparently mandatory nature of the language, YISD officials testified at trial that the policy continued to afford principals discretion to conduct a preliminary investigation of specific complaints before deciding whether to report the incident.

[2] The school district introduced evidence at trial showing that five YISD teachers had been accused of sexual misconduct during this time period. In four cases, a hearing before the Board of Trustees was proposed. Two of the teachers elected to resign rather than go before the Board; the two others were dismissed after the Board determined that the allegations of sexual abuse were true. In the fifth case, a hearing was not scheduled because school officials believed they "had no case" against the teacher in question. Nevertheless, the teacher was relieved of his classroom duties and transferred to a records warehouse within the district.

informal memorandum and an oral reprimand of Mares. She nonetheless received a second, more serious complaint from the same parent one month later, alleging that Mares had this time placed his hand around the waist of her daughter. Even though the child and Mares both verified the incident, Morales' disciplinary response was limited to issuing a second oral reprimand and directing Mares to enter a general "improvement" program. This sanction in any event apparently had a salutory effect, as allegations regarding Mares' conduct came to a temporary halt.

In January 1985, however, Principal Morales received an urgent phone call from Graciela Peña, the mother of one of the female students in Mares' fifth grade Spanish class. Mrs. Peña insisted that Morales remove her daughter, Leticia, from Mares' class at once. When asked the reason for this request, Mrs. Peña, after some hesitation, informed Morales that Leticia had told her that Mares had placed his hand on her waist and stuck his tongue in her ear. Morales again sought direction from Resendez regarding the course of investigation. Resendez this time enlisted the aid of Kenneth DeMore who, as the school district's Director of Employee Relations, usually handled teacher grievances and complaints. Morales first met with Mares to discuss the incident. Mares admitted that he had been alone in the classroom with Leticia and had placed his hand around her waist, but denied any further improper conduct. Morales and DeMore interviewed Leticia a few days later on February 4, 1985. Leticia told them that Mares had

4

approached her from behind as she was drawing at the blackboard, wrapped his arm around her waist, and stuck his tongue in her ear.

This interview marked the end of the investigatory process. Testimony at trial disclosed the school officials' knowledge of the 1981 allegations against Mares, that Morales, the only person who questioned both Leticia and Mares, believed that Leticia was telling the truth, and that the administrators considered the alleged conduct to be actionable sexual abuse. Nonetheless, Morales, DeMore, and Resendez neither called the Department of Human Resources nor took any immediate remedial steps on their own. Rather, the school officials decided to "drop the matter" and merely include the incident in the customary evaluation of Mares' overall classroom performance.[3] All three officials stated that this abrupt conclusion of the investigation came at the request of Mrs. Peña, who, according to their testimony, made it clear that she wished to proceed no further.

Leticia Peña's allegations of sexual abuse had no discernible effect on Mares' standing at Ascarate Elementary School. On February 15, just two weeks after his alleged assault, Morales gave Mares what she described as a "good evaluation," rating his classroom performance just one point short of "exceeds expectations." After Mares filed a grievance challenging this evaluation as "unfair," Morales adjusted his score even higher in

---

[3]     Morales testified that Mares was also to receive an official reprimand to be prepared by DeMore, the official in charge of these actions. DeMore, however, stated that both he and Morales intended to "drop the matter" and that, in any event, the primary responsibility for issuing reprimands lay with Morales.

April. Mares capped an eventful spring later that month by being elected President of the Ascarate Elementary School PTA.

Mares' election came as a shock to Graciela Peña and her husband Fernando. Contrary to the account given by Morales, the Peñas testified that they had neither failed to cooperate nor asked her to terminate the school district's investigation of Mares' assault on their daughter. While they may have expressed some misgivings about the repeated questioning of Leticia, the Peñas were under the impression that the investigation would continue until the appropriate resolution was reached. Nor was the resolution of their complaint subject to doubt. Resendez and DeMore testified that Morales was the only school official to talk to Mrs. Peña regarding the incident. Mrs. Peña stated at trial, however, that Resendez had personally informed her that Mares would be brought to YISD's central office for a recorded hearing on the matter and would receive an official reprimand directing him to seek counseling and avoid any further one-on-one contact with students. Mares was also to be transferred to another school where he would be closely monitored to ensure that he complied with these terms. Mares' election as PTA President signalled to the Peñas that these remedial steps had not been taken, that, far from being punished for his transgression, Mares had in fact been "rewarded."

The Peñas were not without means to correct this perceived breach of trust, for Mares' election to the Ascarate PTA presidency coincided with Fernando Peña's own election to the YISD Board of Trustees. Upon taking office in May, Mr. Peña went to Principal

Morales' office to determine whether the official reprimand promised his wife in February had been placed in Mares' file. After Peña was unable to locate the reprimand in the files at Ascarate, Morales told him that it had been forwarded to the central office. Peña then discovered that those files contained neither the reprimand nor any evidence of the investigation into Mares' sexual abuse of his daughter. It was at this point that Mr. Peña learned that, contrary to the assurances given to Mrs. Peña by Resendez, school officials had, as DeMore admitted at trial, simply "dropp[ed] the matter."

Mr. Peña then decided to take up the Mares incident directly with the Board. After documenting the sharp divergences between the actions promised by school officials and those that were taken, Peña called an emergency meeting of the Board of Trustees in late May. With the entire Board as well as Resendez, YISD Superintendent Jim Hensley, and Deputy Superintendent Jerry Barber present, Peña submitted documents detailing Mares' assault on Leticia and the administration's subsequent attempt to "cover up" the incident. Resendez responded to Peña's strong charges by offering his own account of the events surrounding the investigation. Resendez informed the Board that the district had determined that the allegations lacked substance and that the investigation had been closed at Mrs. Peña's request. Mr. Peña in turn asserted that there was no truth to Resendez's statements and, in particular, vehemently denied that his wife had ever asked school officials to halt their investigation. Hensley and Barber,

7

who had assumed their roles just a few weeks before in early May, then intervened, stating that they had not been advised of this incident involving Mares. It was determined that Barber would investigate the incident personally and deliver a full report to the Board.

School district policy provided that employees such as Mares could be dismissed only after a hearing before the Board of Trustees. Barber was charged with examining Mr. Peña's allegation that Morales, DeMore, and Resendez had conspired to "cover up" the sexual abuse of his daughter and with determining whether there was enough evidence to commence termination proceedings against Mares. Barber concluded that the school officials should be reprimanded for failing to "follow through" in their own investigation of the incident, but recommended against holding a hearing.

The investigation supporting these findings was cursory at best. Despite Mr. Peña's charges that Morales, DeMore, and Resendez had repeatedly "lied" about their handling of Leticia's case, Barber's inquiry into the incident consisted solely of discussions with these same school officials. At the Board meeting, Peña had vigorously disputed Resendez's assertion that he and his wife had refused to cooperate with school officials. Barber nevertheless accepted his subordinates' statements that the Peñas did not wish to involve themselves or their daughter in the investigation and thus made no attempt to contact them. His belief that a hearing was not warranted, however, apparently did not rest on the credibility of Leticia's complaint or her parents' perceived

8

unwillingness to allow her to testify against Mares. Barber could not specifically recall at trial whether he asked Morales whether she believed the child's allegations and, more importantly, he indicated that even Leticia's testimony alleging conduct that "certainly" constituted sexual abuse would not suffice. According to Barber, there was in his view no "evidence" or "proof" of abuse, not because Leticia refused to come forward, but because "Mr. Mares continued to deny it." In sum, without additional evidence, such as confirmation of additional witnesses, "the testimony of a little girl" was not enough to hold a hearing in the face of a teacher's denials. Barber accordingly recommended that disciplinary action against Mares be limited to a written reprimand directing him to seek counseling and an order transferring him from Ascarate to Glen Cove, another elementary school within YISD.

After Superintendent Hensley concurred in Barber's report and recommendation, it was explained and submitted to the Board of Trustees for its approval. While the record discloses that the Board, after discussion of the matter, ultimately voted in favor of transferring Mares, it is not clear whether its consideration of this issue was confined to a single evening or extended over several meetings during late May and early June.[4] It is clear, however, that Fernando Peña, whose testimony provided the only

---

[4] For this reason, we are unable to ascertain whether the Board's formal decision preceded the reprimand issued Mares, dated May 31, and the grievance filed by Mares in response on June 6. We do not hold this lacuna in the record to be of any significance, however, since the grievance was ultimately resolved by the administration in August 1985, some two months after the Board chose to transfer Mares rather than remove him from the classroom.

9

direct evidence of the Board's deliberations, vigorously opposed the administration's recommendation and demanded that more serious measures be taken. Peña had castigated the administration during the first meeting, but he now focused his fire on the Board itself: "[I]n one of my temper tantrums, I said, 'I wouldn't wish this [the abuse of a child] on anybody but this school board, because they need to be in my shoes to see how it feels.'" Despite his persistence and his sharp criticism of the Board, Peña testified that he "didn't have the votes" and thus "could never get anybody to do anything except transfer him." Peña continued to view the transfer of Mares as plainly "inadequate," but also recognized that it was the most he could hope to "extract" from his fellow Board members.

Mares' first year at Glen Cove Elementary School passed without incident. On March 9, 1987, however, Mares molested Jessica Gonzalez, one of the students in his first grade Spanish class. The record showed that the assault occurred after Jessica asked Mares for permission to get a drink of water. After Jessica left her seat, Mares followed her over to the water fountain and, as she leaned over, placed his hand inside her underwear and touched her vagina. When Jessica reported Mares' actions to her mother that afternoon, Gloria Gonzalez immediately returned to school with her daughter and a family friend to speak to Richard Gore, Glen Cove's Principal.

Gore "did not go into the full details" of the incident at this brief meeting and thus did not obtain a statement from

10

Jessica, but he was able to gain the substance of the allegation from Mrs. Gonzalez. Gore also learned that the Gonzalezes had already contacted the police. In accordance with YISD policy, Gore reported the alleged assault to the Texas Department of Human Resources and then consulted Resendez. Resendez decided immediately to suspend Mares with pay pending a hearing before the Board of Trustees. Notwithstanding the Gonzalezes' refusal to cooperate in the investigation, the Board held a hearing and voted to suspend Mares without pay pending the outcome of the criminal investigation into the incident. After a trial in Texas state court, at which Leticia Peña and Jessica Gonzalez both testified, Mares was convicted on charges of indecency with a child. The Board fired Mares on grounds that he had been convicted of a felony in August 1987.

The Gonzalezes filed this § 1983 suit in U.S. District Court for the Western District of Texas in March 1989, contending that their daughter's injuries were attributable to the school district's policies and customs regarding sexual abuse.[5] At trial, YISD conceded that Jessica Gonzalez' constitutional right to personal security had been violated and the only issue for the jury was the responsibility of the school district.

The district court submitted both "policy" and "custom" as two distinct theories of liability, with separate interrogatories under Rule 49 of the Federal Rules of Civil Procedure. The jury declined

---

[5] The Gonzalezes elected to proceed against the school district only; none of the various school employees and administrators involved were named as defendants.

to find that YISD had "maintained a persistent, widespread custom or practice that authorized, tolerated, or condoned sexual abuse of students by teachers." The jury did find, however, that the school district had a "formal policy, statement, ordinance, regulation or decision that authorized, tolerated, or condoned sexual abuse of students by teachers." The jury also expressly found that this policy proximately caused Jessica Gonzalez' injuries and awarded damages of $500,000. The district court denied YISD's motion for judgment notwithstanding the verdict and entered judgment in favor of the Gonzalezes. The school district then filed a timely notice of appeal.

## II.

The school district makes three main points on appeal. It first contends that the jury's finding that a district "policy" caused the injury to Jessica Gonzalez is not supported by the evidence. YISD also maintains that the trial court did not charge the jury that only those actions by the Board of Trustees could sum to district policy. Finally, the school district asserts that the trial court erred in failing to charge the jury that YISD could be held liable for Jessica Gonzalez' injuries only if the decision by the Board of Trustees manifested deliberate indifference to the constitutional rights of schoolchildren.[6]

---

[6] As we indicated above, the school district conceded for purposes of trial that the Due Process Clause afforded students protection from sexual abuse by school employees. It also conceded that Mares' March 9, 1987 assault on Jessica Gonzalez constituted a violation of this constitutional right. For this reason, we have no occasion to consider the existence and contours of this asserted constitutional right, an issue pending before the en banc court.

The Gonzalezes argue that these issues are not properly before this court because the school district failed to preserve them for appeal. Specifically, they assert that YISD's failure to move for a directed verdict precludes a review of the sufficiency of the evidence. Second, there was no objection to any failure of the charge to identify the Board of Trustees as the sole policymaking entity. Finally, the Gonzalezes maintain that YISD waived the deliberate indifference instruction as well.

A.

The school district moved for directed verdict both at the close of the Gonzalezes' case and at the conclusion of all the evidence. The grounds asserted by YISD in each motion, however, were not, at least on their face, identical. At the close of the Gonzalezes' case-in-chief, the school district cited two reasons in support of its motion:

> [T]he plaintiffs' evidence does not support the proposition that any policymaker displayed any deliberate indifference to the rights of Jessica Gonzalez in the exercise of the investigation policy and the policy FFG dealing with investigations and reporting of complaints about sexual abuse of children. Also on the grounds that the plaintiff has not proved that the investigation policy caused Andres Mares to commit the abuse against Jessica Gonzalez in 1987.

At the close of all the evidence, the school district renewed its motion for directed verdict. It repeated the two grounds offered in the first motion, but then added "that it has not been shown that there was any policymaker involved with any of the action that

---

See Doe v. Taylor Independent School Dist., 975 F.2d 137 (5th Cir. 1992), reh'g, en banc, granted, 987 F.2d 231 (5th Cir. 1993).

13

could have conceivably caused any injury. No one who made any decisions under the policy was in fact a policymaker."

The Gonzalezes maintain that the school district's failure to include this "separate" issue--which they understand to be that their daughter's injuries were not caused by any actions taken by policymakers--prohibits it from raising it on appeal. According to the Gonzalezes, we may not review the evidence supporting a particular element "unless a motion for directed verdict was made at both the close of a plaintiffs' case and the close of all the evidence by the party seeking review." Since Rule 50 requires movants to "state the specific grounds therefor," the argument continues, a claim that is raised for the first time at the close of the evidence is not preserved for appeal. The Gonzalezes thus conclude that YISD has waived its challenge to the evidence supporting the jury's finding that Jessica's injuries were caused by the decisions made by the district's policymakers.

This argument is meritless. In the first instance, we read the purportedly "new" ground that "there was [no] policymaker involved with any of the actions that could have conceivably caused any injury" advanced at the close of the evidence to be fairly included in the first motion, which requested a directed verdict "on the grounds that the plaintiff has not proved that the investigation policy caused Andres Mares to commit the abuse against Jessica Gonzalez in 1987." As the school district suggests, and our discussion below discloses, the policymaker's actions and YISD "policies" are inseparable, for the district

14

"policy" at issue in this case consists of the decisions made by the policymakers.[7]

Moreover, appellate review would not be barred even if we were to view the motion offered at the close of all the evidence as raising a new issue. The Gonzalezes maintain that only those grounds contained in directed verdict motions filed at the close of the plaintiff's case are preserved for appeal. This interpretation of Rule 50 is flatly inconsistent with our precedents, which require only a motion at the close of all the evidence: "According to Rule 50 (b) of the Federal Rules of Procedure, a party may only base a motion for judgment notwithstanding the verdict on a ground that he included in a prior motion for directed verdict at the close of all the evidence." Hinojosa v. City of Terrell, 834 F.2d 1223, 1227-28 (5th Cir. 1988) (citing Jones v. Benefit Trust Life Ins. Co., 800 F.2d 1397, 1401 (5th Cir. 1986); Sulmeyer v. Coca Cola Co., 515 F.2d 835 (5th Cir. 1975), cert. denied, 424 U.S. 934 (1976)); Bohrer v. Hanes Corp., 715 F.2d 213, 217 (5th Cir. 1983), cert. denied, 104 S.Ct. 1284 (1984); Merwine v. Board of Trustees, 754 F.2d 631, 634 (5th Cir.), cert. denied, 106 S.Ct. 76 (1985). See also Redd v. City of Phenix, 934 F.2d 1211, 1214 (11th Cir.

---

[7] Thus, the school district's motion for judgment notwithstanding the verdict listed only two grounds for relief:

(a) The evidence does not support the proposition that any policymaker displayed any "deliberate indifference" to the rights of Jessica Gonzalez by any decision or in the exercise of the School District's investigation policy; and

(b) The investigation policy of the School District and decision made pursuant thereto did not "cause" Andres Mares to sexually abuse Jessica Gonzalez.

1991); <u>Riverview Investments, Inc. v. Ottawa Community Imp. Corp.</u>, 899 F.2d 474, 476 (6th Cir.), <u>cert. denied</u>, 111 S.Ct. 151 (1990); <u>Reeves v. Teuscher</u>, 881 F.2d 1495, 1498 (9th Cir. 1989). We will review YISD's challenge of the sufficiency of the evidence on the merits.[8]

### B.

The school district also contends that the district court erred in failing to identify, prior to submitting the case to the jury, the actors responsible for determining policy. Specifically, it maintains that the trial court should have instructed the jury that only the actions of the Board of Trustees, to the exclusion of

---

[8] Failure to comply with Rule 50 will not, in certain circumstances, preclude appellate review. <u>See</u> 9 C. Wright & A. Miller, Federal Practice and Procedure § 2537, at 596-98 (1971 & 1992 Supp.). The most common exception is not, as the Gonzalezes' theory might have it, cases in which a motion was made at the close of the evidence but not at the close of plaintiff's case-in-chief, but those where a motion made after the plaintiff's case is not renewed at the close of the evidence. <u>See, e.g.</u>, <u>McCann v. Texas City Refining, Inc.</u>, 984 F.2d 667, 671 (5th Cir. 1993); <u>Miller v. Rowan Companies, Inc.</u>, 815 F.2d 1021, 1024 (5th Cir. 1987); <u>Villanueva v. McInnis</u>, 723 F.2d 414, 416-17 (5th Cir. 1984).

The Gonzalezes have cited only one decision that arguably provides support for its position that Rule 50 requires a motion for directed verdict at the close of the plaintiff's case as well as at the close of all of the evidence. In <u>In re Owners of "Harvey Oil Center"</u>, 788 F.2d 275 (5th Cir. 1986), this court held, without explanation or citation, that "[b]ecause [defendant] failed to move for a directed verdict at the close of the plaintiffs' case, its motion for judgment notwithstanding the verdict on this point had no proper predicate." <u>Id.</u> at 278. This statement, if given the broad application proposed by the Gonzalezes, is inconsistent with what came before, see, e.g., <u>Merwine</u>, 754 F.2d at 634, and what followed. <u>See, e.g.</u>, <u>Hinojosa</u>, 834 F.2d at 1227-28. For this reason, we believe that this apparent holding of <u>Harvey Oil Center</u> is best confined to the special circumstances--collateral estoppel in bankruptcy--present in that case.

16

administrators and teachers, could constitute "official policy" for which YISD was responsible.

The school district properly stresses that it is for the court, not the jury, to determine which officials have final policymaking authority. After some initial disagreement, compare St. Louis v. Praprotnik, 108 S.Ct. 915, 924-25 (1988) (plurality opinion) (this question is a matter of interpretation of state law, and therefore one for the court) with id. at 934 (Brennan, J., concurring in judgment) (jury "must determine where such policymaking authority actually resides"), the Supreme Court settled this issue in Jett v. Dallas Independent School District, 109 S.Ct. 2702 (1989):

> As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury . . . . Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights . . . .

109 S.Ct. at 2723 (emphasis in original). See also Crowder v. Sinyard, 884 F.2d 804, 830 (5th Cir. 1989), cert. denied, 110 S.Ct. 2617 (1990); Worsham v. City of Pasadena, 881 F.2d 1336, 1344 (5th Cir. 1989). Texas law provides that the Board of Trustees is responsible for determining school policy. Tex. Educ. Code Ann. § 23.26 (b). See Kinsey v. Salado Indep. School Dist., 950 F.2d

17

988, 995 (5th Cir.) (en banc), <u>cert. denied</u>, 112 S.Ct. 2275 (1992); <u>Daniels v. Morris</u>, 746 F.2d 271, 277 (5th Cir. 1984).[9]

Our review of the jury instructions discloses that the trial court did not, contrary to the dictates of <u>Jett</u> and <u>Praprotnik</u>, indicate that only the Board of Trustees had the capacity to make policy. Rather, the instructions contain several references to "the Board of Trustees or some person who had final policymaking authority." We find, however, that the school district has not preserved this issue for appeal. "No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51. The school district not only failed to lodge an objection to the court's various references to "the Board of Trustees or some person who had final policymaking authority," but couched its proposed jury instructions, some of which were adopted by the court, in identical terms. The school district has plainly waived this issue.[10]

---

[9] As the Court in <u>Jett</u> indicated, "the relevant legal materials" to be consulted in identifying policymakers include not only "state and local positive law," but also "'"custom or usage"' having the force of law.'" <u>Jett</u>, 109 S.Ct. at 2733 (quoting <u>Praprotnik</u>, 108 S.Ct. at 924 n.1). Neither the Gonzalezes nor YISD, however, has suggested that final policymaking authority within the school district lies other than where Texas statutory law provides.

[10] YISD contends that the district court's omission of this instruction allowed the jury to ground its verdict on the impermissible theory of <u>respondeat superior</u>. We note, however, that the Gonzalezes were careful to confine their policy argument to actions of the Board of Trustees. For example, in his closing argument, plaintiffs' counsel explained the jury's inquiry in these

18

C.

YISD finally contends that the district court committed reversible error in failing to charge the jury that the school district could be found liable under § 1983 only if its policy reflected a deliberate indifference to the constitutional rights of schoolchildren. We find that the school district adequately preserved this issue under Rules 49 and 51 by making several objections to the trial court's omission of the proposed instruction and interrogatory. The propriety of this omission thus depends, as an initial matter, on whether school district liability under § 1983 must be predicated on a showing of deliberate indifference. It is to this question that we now turn.

---

terms: "[T]he second question asks you about a decision of the Ysleta Independent School District. That decision was not made by [Principal] Nellie Morales, it was not made by the administrators, it was made by the Board of Trustees of the Ysleta Independent School District."

Chief Judge Bunton as well as YISD's counsel apparently shared this understanding of the Gonzalezes' policy claim at trial. The following exchange took place during the hearing on the parties' proposed jury instructions:

[Judge Bunton]: As I understand it, they are saying this policy which the board had actually caused Jessica Gonzalez to be molested because instead of getting rid of [Mares] the first time, or instead of putting him in a warehouse or something, [whatever] they did with somebody else, instead of doing that, they allowed him to go right back into the classroom, the same deal with little girls. That is my understanding of the theory. Is that wrong?

[Counsel]: That may be the theory, but it is the defendants' contention that under the law, that is not enough to show a 1983 liability against a school district.

19

III.

The Gonzalezes prevailed at trial on the theory that the YISD Board of Trustees' decision to transfer Mares to their daughter's school was a proximate cause of Jessica's injury. The school district contends that such an allegation, even if accepted as true, cannot support a finding of liability under § 1983. YISD asserts that an ad hoc, isolated decision, even when made by policymakers, does not constitute the sort of "policy" upon which municipal liability may be predicated under Monell v. New York City Dep't of Social Services, 436 U.S. 658 (1978), especially where, as here, this act is contrary to the district's own formal policies for handling the matter in question. Second, and more importantly, YISD maintains that even if a single, aberrant decision may establish an actionable "policy," liability cannot attach unless the decisionmaker was at a minimum deliberately indifferent to its likely consequences. Because the district court's instructions did not require the jury to find that the Board of Trustees acted with the requisite level of fault, YISD asserts that its verdict in favor of the Gonzalezes cannot stand.

We find the school district's first argument unpersuasive. Under Monell, local governments are responsible for constitutional wrongs visited upon citizens pursuant to official "policy." "Policy" consists of a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," Monell, 436 U.S. at 690, and encompasses the actions of

20

a municipality's "lawmakers" as well as "those whose edicts or acts may fairly be said to represent official policy." Id. at 694. The term "often refers to formal rules and understandings," but its meaning is not exhausted by "fixed plans of actions to be followed under similar circumstances consistently and over time." Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81 (1986). To the contrary, it is well established that a municipality may be held liable for "course[s] of action tailored to a specific situation and not intended to control decisions in later situations," provided that "the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers." Id. at 481. See, e.g., id. (county prosecutor ordered a forcible entry into physician's office); Newport v. Fact Concerts, Inc., 101 S.Ct. 2748 (1981) (city council cancelled concert because of disagreement over performance's content); Owen v. City of Independence, 445 U.S. 622 (1980) (city council passed a resolution firing police chief without a pretermination hearing); Hill v. City of Pontotoc, No. 92-7337 (5th Cir. 1993) (board of alderman fired fire chief without due process); Boddie v. City of Columbus, 989 F.2d 745 (5th Cir. 1993) (fire chief terminated employee because of union activities). Finally, the existence of a well-established, officially-adopted policy will not insulate the municipality from liability where the policymaker herself departs from these formal rules. See, e.g., Praprotnik, 108 S.Ct. at 928.

The Board of Trustees' conscious decision to transfer Mares in response the Peñas' allegations rather than remove him from the

21

classroom or report the incident to the Department of Human Resources--the response its past practice might have portended and its own sexual abuse policy would seem to have required--plainly constitutes a "policy" attributable to the school district. Courts often face difficult questions regarding the location, see, e.g., Praprotnik, or scope, see, e.g., Auriemma v. Rice, 957 F.2d 397, 399-401 (7th Cir. 1992), of final policymaking authority, but "[n]o one has ever doubted . . . that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body." Pembaur, 475 U.S. at 480. The Board's decision to transfer Mares represents a final action by the entity charged with making and executing policy within the school district; it is indistinguishable in this respect from the actions taken by the city councils in Newport and Owen and the county prosecutor in Pembaur.

The "policy" in this case differs from those at issue in Monell and other prior cases in another, significant way, however. In those cases, the policymaker's decision directly ordered the action found to be unconstitutional. Monell, for example, involved a written rule which the Court interpreted to require pregnant employees to take unpaid leaves of absence before they were medically necessary; Newport, a decision by the city council to cancel a concert on the basis of content; Pembaur, a decision by the county prosecutor forcibly to enter an office. The "policy" in each instance not only led to a constitutional violation, but compelled it. In this case, however, the Gonzalezes do not

22

maintain that the Board ordered Mares to assault their daughter or that it intended this result. The Board's "policy" may have produced or caused the constitutional violation but, unlike the policymaker's actions in Monell and Pembaur, it is not itself unconstitutional. Both parties recognize this factual dissimilarity, but differ sharply as to its legal relevance.[11]

The Gonzalezes argue, as Justice Brennan did in City of Oklahoma City v. Tuttle, 105 S.Ct. 2427 (1985), that any "distinction between policies that are themselves unconstitutional and those that cause constitutional violations" is "metaphysical": "If a municipality takes actions--whether they be of the type alleged in Monell, Owen, or this case--that cause the deprivation of a citizen's constitutional rights, § 1983 is available as a remedy." Id. at 2441 n.8 (Brennan, J., concurring). "Monell," the Gonzalezes, again following Justice Brennan, contend, "is a case about responsibility." Pembaur, 106 S.Ct. at 1297. The distinction between the acts of the municipality and the acts of its employees is preserved--and respondeat superior avoided-- through an exacting application of Monell's "'official policy' requirement," id. at 1298, which provides that "municipality liability under § 1983 attaches where--and only where--a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for

---

[11] The distinction between constitutional and unconstitutional policies is frequently a matter of semantics in cases in which a single decision is challenged. This is not true here, however, because the school district conceded the constitutional violation.

23

establishing final policy with respect to the subject matter in question." Id. at 1300. Where the direct action of the policymaker, rather than the conduct of subordinates, is involved, the municipality has itself acted, and the sole question is one of causation. This final issue, while not to be gauged by the standards of ordinary tort law, see Martinez v. California, 444 U.S. 277, 285 (1980), does not warrant an approach that would attach significance to the facial validity of the challenged policy.

The school district maintains that the concept underlying Monell is not "responsibility," but "fault," for, contrary to the Gonzalezes' reading, Monell "provides a fault-based analysis for imposing municipal liability." Tuttle, 105 S.Ct. at 2433 (plurality). YISD agrees that Monell's emphasis on "policy" serves to foreclose liability on the impermissible basis of respondeat superior, but urges that this "requirement was intended to prevent the imposition of municipal liability," not in cases in which policymakers were not responsible, but "under circumstances where no wrong could be ascribed to municipal decisionmakers." Id. at 2435 (emphasis added). Put another way, § 1983 permits recovery only "when it can be fairly said that the city itself is the wrongdoer." Collins v. City of Harker Heights, 112 S.Ct. 1061, 1067 (1992).

According to the school district, "establish[ing] the existence of the policy," at least as the Gonzalezes and Justice Brennan understand that term, is necessary but not sufficient under

24

§ 1983; plaintiffs must also introduce "evidence showing that the city was at fault for establishing the policy." City of Springfield v. Kibbe, 107 S.Ct. 1114, 1121 (1987) (O'Connor, J., dissenting). Predicating municipal liability solely on the presence of "a deliberate choice to follow a course of action" on the part of policymakers would render Monell a "dead letter," since the sheer number of such decisions required by governance ensures that "if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any such harm inflicted by a municipal official." Tuttle, 105 S.Ct. at 2436. Where the challenged policy is unconstitutional on its face, as those in Monell, Owen, Newport, and Pembaur were, no additional "evidence [is] needed other than a statement of the policy by the [policymaker], and its exercise," id., for it is plain that the constitutional violation flows directly from the policymaker's deliberate choice. On the other hand, where, as here, a policy in some sense causes, but does not compel, a constitutional violation, plaintiffs must establish that the particular harm-producing deficiency "resulted from conscious choice," that is, they must supply "proof that the policymakers deliberately chose [measures] which would prove inadequate." Id. Unless the policy itself is unconstitutional, YISD concludes, § 1983 provides a remedy only if it was enacted with deliberate indifference to constitutional rights.

The school district locates this bright-line rule in City of Canton v. Harris, 109 S.Ct. 1197 (1989). In Canton, a unanimous

25

Court held that a facially valid municipal policy may give rise to § 1983 liability if, as a result of inadequate training, it is unconstitutionally applied by city employees. Id. at 1204. In keeping with Monell's proscription of respondeat superior as a theory of recovery, the Court limited liability to those cases where the city's failure to train amounts to deliberate indifference to the constitutional rights of its citizens. Id. at 1204-05. It is only when such an omission "evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983," which, the Court reminded, consists of "'a deliberate choice to follow a course of action . . . made from among various alternatives' by city policy makers." Id. at 1205 (quoting Pembaur, 106 S.Ct. at 1300) (ellipses added)); see also id. at 1208 (O'Connor, J., concurring) ("Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of Monell are satisfied"). Because the Board of Trustees' decision regarding Mares was not itself unconstitutional, YISD concludes, the Gonzalezes may prevail under Canton only if the Board was deliberately indifferent to the welfare of students in failing to remove him from the classroom.

The Gonzalezes do not, at least at the outset, challenge Canton's "deliberate indifference" requirement, but question the

26

rule's application to claims, such as theirs, where a "policy" has been established. Such claims rest on the actions of the policymaker, and therefore differ materially from "failure to train" claims, which, like those alleging an unconstitutional "custom," seek to hold the city liable for the policymaker's omissions. In custom cases, as in "failure to train" cases, plaintiffs contend that improper conduct among employees should be attributed to the city "even though such a custom has not received formal approval through the body's official decisionmaking channels." Monell, 436 U.S. at 691. Noting that the Court in Canton appeared to equate these two types of claims by suggesting that Harris' "custom" claim was "little more than a restatement of her 'failure-to-train as policy' claim," 109 S.Ct. at 1203 n.5, the Gonzalezes point out that the inquiry prescribed by the Court in Canton closely resembles the standard applied in custom cases. Compare 109 S.Ct. at 1205 & n.10 ("need for further training [is] plainly obvious to the city policy makers" but they fail to act) and id. at 1208 (O'Connor. J., concurring) (policymakers fail to act despite having "actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens") with Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir.) (municipalities may be held liable on the basis of custom if policymakers had "actual or constructive knowledge of [city employees' misconduct] yet did nothing to end the practice"), cert. denied, 110 S.Ct. 75 (1989). Through the use of a familiar tort law construct,

27

plaintiffs in each case ask courts to infer act from omission, assent from silence, by showing that policymakers were aware of abusive or deficient practices and yet did nothing to curb them. The "deliberate indifferent" requirement permits courts to separate omissions that "amount to an intentional choice" from those that are merely "unintentionally negligent oversight[s]." Rhyne v. Henderson County, 973 F.2d 386, 392 (5th Cir. 1992).

Proof of deliberate indifference is unnecessary here, the Gonzalezes assert, because we need not rely on inferences to establish the existence of an intentional choice for which the school district should be held responsible. The YISD Board of Trustees did make a "deliberate choice . . . from among various alternatives." Pembaur, 106 S.Ct. at 1300. It could have suspended Mares, ordered further investigation, scheduled a hearing, issued a more severe reprimand, or even provided for closer monitoring of his classroom. Instead, the Board chose to transfer him to a different elementary school within the district. To require an additional showing of deliberate indifference would collapse the dichotomy between act and omission underlying "policy" and "custom" as distinct theories of recovery and impermissibly deprive the school board's decision of legal significance.

The Gonzalezes' contention that the relevant distinction under § 1983 lies between the policymaker's acts and omissions, not unconstitutional and constitutional policies, is not wholly unpersuasive. Their argument is, however, foreclosed by Canton, where the Court made plain that municipal liability must be

28

predicated upon a showing of "fault," not merely "responsibility." While a claim cast in terms of a "failure to train" suggests an attempt to hold the city liable for its omissions, the Court recognized that Harris' suit could also be characterized as a challenge to the city's existing training program; her claim that "the city 'could have done' [something] to prevent the unfortunate incident," Canton, 109 S.Ct. at 1206, was at bottom an assertion that the city should have provided "more or different training." Id. at 1205. Since the inadequate training program had been officially adopted by the city's policymakers, the Court indicated that it could be regarded as a "policy for which the city is responsible." Id. "That much may be true," the Court stated, but proof of an inadequate policy, without more, is insufficient to meet the threshold requirements of § 1983. Id. In order to establish an actionable "policy" under Monell, plaintiffs must demonstrate that the particular inadequacies which led to the constitutional violation, not simply the program itself, were the products of deliberate choice. In the absence of a facially unconstitutional policy, that is, "a policy of not taking reasonable steps to train its employees," id., plaintiffs may establish the requisite fault by proving that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id. It is only with this additional showing that a "'policy of inaction'" becomes an

29

actionable "decision by the city itself to violate the Constitution."  Id. at 1208 (O'Connor, J., concurring).

The circuits have uniformly interpreted Canton's "deliberate indifference" requirement, announced in the context of a "failure to train" claim, to apply to all cases involving facially constitutional policies.  As the Ninth Circuit, for example, recently held:

> The existence of a policy, without more, is insufficient to trigger local government liability under section 1983. Under City of Canton, before a local government entity may be held liable for failing to act to preserve a constitutional right, plaintiff must demonstrate that the official policy "evidences a 'deliberate indifference'" to his constitutional rights.

Oviatt v. Pearce, 954 F.2d 1470, 1477 (9th Cir. 1992) (quoting Canton, 109 S.Ct. at 1205) (citations omitted).  See Rhyne v. Henderson County, 973 F.2d 386, 392 (5th Cir. 1992) ("[the issue is] whether Henderson County acted with deliberate indifference in adopting policies regarding care of inmates known to be suicidal"); Benavides v. County of Wilson, 955 F.2d 968, 974 (5th Cir.) (the evidence "does not indicate that [the sheriff] was deliberately indifferent in hiring or retaining . . . jailers and deputies"), cert. denied, 110 S.Ct. 2617 (1990); Crowder v. Sinyard, 884 F.2d 804, 830-31 (5th Cir. 1989) ("There is nothing in the record before us that indicates that any policies of the City of Texarkana reflected deliberate indifference to any constitutional concerns or were anything other than generic policies favoring effective law enforcement"), cert. denied, 110 S.Ct. 2617 (1990); Wassum v. City of Bellaire, 861 F.2d 453, 456 (5th Cir. 1988) ("a plaintiff must

30

demonstrate that those hiring practices that led it to employ the police officer constituted gross negligence amounting to conscious indifference to the welfare of the public"); Graham v. Sauk Prairie Police Commission, 915 F.2d 1085, 1100-01 (7th Cir. 1990) ("Clearly these procedures do not directly violate any constitutional guarantees. Like the plaintiff in Canton, Graham bases her § 1983 municipal liability claim solely on the defendants' allegedly inadequate acts as 'policy.' Accordingly, the standard of fault and the principles which applied to the claim of inadequate training in Canton must guide our determination of municipal liability in this case"); Ware v. Unified School Dist., 902 F.2d 815, 819 (10th Cir. 1990) ("we remain convinced that a causal connection between the unconstitutional act and the authorized decisionmakers may be established when the governing body has exercised its decisionmaking authority with deliberate indifference to the constitutional rights of those affected by its decisions"); D.T. by M.T. v. Independent School Dist., 894 F.2d 1176, 1193 (10th Cir.) ("a consciously adopted 'policy' (here the established procedure of the School District in the investigation, hiring and supervision of teachers) must, in a causal sense, reflect deliberate indifference to the constitutional rights of [students]"), cert. denied, 111 S.Ct. 213 (1990); Dorman v. District of Columbia, 888 F.2d 159, 165 (D.C.Cir. 1989) ("there is no evidence of a conscious choice or a policy of deliberate indifference") (emphasis in original); Stoneking v. Bradford Area School Dist., 882 F.2d 720, 725 (3d Cir. 1989) ("As the Supreme

31

Court recently reconfirmed in [Canton], a municipality may be held under section 1983 where its policymakers made 'a deliberate choice to follow a course of action . . . from among various alternatives,' and the policy chosen 'reflects deliberate indifference to the constitutional rights of [the city's] inhabitants'" (quoting Canton, 109 S.Ct. at 1205-06), cert. denied, 110 S.Ct. 840 (1990).

The Gonzalezes' "policy" claim is indistinguishable from those advanced in these previous cases. They do not argue that the Board's decision itself violated the Constitution by ordering or compelling Mares to assault their daughter. Rather, they maintain, as Fernando Peña testified, that its choice to transfer Mares in response to allegations of sexual abuse was "inadequate." As such, their claim is controlled by Canton and our many precedents that have required a showing of deliberate indifference before holding a city liable for a policymaker's mistaken personnel decisions. See, e.g., Benavides, 955 F.2d at 972-75.

The Gonzalezes argue that this broad reading of Canton brings the decision into conflict with several of the Court's prior holdings and therefore cannot be correct. Specifically, they contend that conditioning recovery upon proof that policymakers acted with deliberate indifference to constitutional rights improperly imports a state of mind requirement into § 1983, see Daniels v. Williams, 106 S.Ct. 662, 664 (1986); Parratt v. Taylor, 451 U.S. 527, 534 (1981); Monroe v. Pape, 365 U.S. 167, 187 (1961), and has the effect of extending good-faith immunity to

32

municipalities, a step expressly rejected by the Court in <u>Owen v. City of Independence</u>, 445 U.S. 622 (1980). This argument gives us pause, but does not provide grounds for this court to adopt the Gonzalezes' approach.

The Supreme Court has consistently held that § 1983 "contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right." <u>Daniels</u>, 106 S.Ct. at 664; <u>Parratt</u>, 451 U.S. at 534 ("Nothing in the language of § 1983 or its legislative history limits the statute solely to intentional deprivations of constitutional rights . . . . Section 1983, unlike its criminal counterpart, 18 U.S.C. § 242, has never been found by this Court to contain a state-of-mind requirement"). In <u>Canton</u>, however, the Court held that plaintiffs bringing "failure to train" claims must prove that the city's policymakers' failure to adopt additional precautions reflected deliberate indifference to the rights of citizens, a standard of fault which, the Court made plain, remained separate from, and independent of, the state-of-mind necessary to establish a constitutional violation. <u>Canton</u>, 109 S.Ct. at 1204 n.8 ("The 'deliberate indifference' standard we adopt for § 1983 'failure to train' claims does not turn upon the degree of fault (if any) that a plaintiff must show to make out an underlying claim of a constitutional violation"); <u>accord</u> <u>Collins v. City of Harker Heights</u>, 112 S.Ct. 1061, 1068 n.7. The Gonzalezes contend that the holdings in <u>Daniels</u> and <u>Parratt</u> may be preserved only if <u>Canton</u>'s rationale does not reach inadequate, but constitutional policies

33

and decisions, and is instead confined to cases in which policymakers have truly failed to act. Otherwise, they conclude, the Court's decision represents an adoption, sub silentio, of a view previously urged only in dissent. See Procunier v. Navarette, 434 U.S. 555, 568 (1978) (Burger, C.J., dissenting) ("Neither the language nor the legislative history of § 1983 indicates that Congress intended to provide remedies for negligent acts. I would hold that one who does not intend to cause and does not exhibit deliberate indifference to the risk of causing the harm that gives rise to a constitutional claim is not liable for damages under § 1983").

As stated above, see supra at 29-32, we do not believe that Canton is capable of bearing this reading. In order for municipal liability to attach, plaintiffs must offer evidence of not simply a decision, but a "decision by the city itself to violate the Constitution." Id. at 1208 (O'Connor, J., concurring). Inadequate, but constitutional policies and decisions rise to the same, actionable plane as the unconstitutional policies considered in Monell, Owen, Newport, and Pembaur only upon a showing that they were enacted or made with deliberate indifference to their possible unconstitutional consequences. Since "[f]acially unconstitutional policies that mandate unconstitutional conduct evince an intent that such violations occur," Kritchevsky, Making Sense of State of Mind: Determining Responsibility in Section 1983 Municipality Liability Litigation, 60 Geo. Wash. L. Rev. 417, 473 n.292 (1992), Monell's policy requirement may be restated wholly in terms of

34

fault: "A municipality only can be held liable for a constitutional violation caused by a municipal policy that manifests at least deliberate indifference to constitutional rights." Id. at 473. See, e.g., Medina v. Denver, 960 F.2d 1493, 1500 (10th Cir. 1992); ("negligence and gross negligence do not give rise to section 1983 liability"); Stokes v. Bullins, 844 F.2d 269, 273 (5th Cir. 1988) ("One may read the tea leaves and conclude that mere negligence will not ultimately be a sufficient basis for § 1983 municipal liability"); cf. Buffington v. Baltimore County, 913 F.2d 113, 122 n.2 (4th Cir. 1990) (The standard of fault announced in Canton "does not of course displace the firmly established rule that § 1983 contains no independent state-of-mind requirement governing the liability of the immediate wrongdoer"), cert. denied, 111 S.Ct. 1106 (1991). See also Bator, et al., Hart & Wechsler's The Federal Courts and the Federal System 1256-57 (3d ed. 1988); Brown, Correlating Municipal Liability and Official Liability under Section 1983, 1989 U. Ill. L. Rev. 625, 654; Mead, 42 U.S.C. § 1983 Liability: The Monell Sketch Becomes a Distorted Picture, 65 N.C.L. Rev. 517, 545 (1987); Nahmod, Section 1983 Discourse: The Move from Constitution to Tort, 77 Geo.L.J. 1719, 1729 n.71 (1989). Daniels and Parratt notwithstanding, what the Gonzalezes would describe as Canton's deliberate indifference "exception" has apparently become the rule, at least for these commentators and courts.

The Gonzalezes maintain that this "rule," under which municipalities may be held liable only if their policies reflect a deliberate indifference to constitutional rights, also contravenes

the Court's decision in <u>Owen v. City of Independence</u>, 445 U.S. 622 (1980).  In <u>Owen</u>, the Court found that the history and policy considerations underlying § 1983 did not support an extension of the good-faith immunity enjoyed by public officials in their individual capacities to municipalities.  See <u>id.</u> at 657.  While qualified immunity shields a city's officers from damages caused by their transgression of rights not "clearly established" at the time of their conduct, see, e.g., <u>Anderson v. Creighton</u>, 107 S.Ct. 3034 (1987); <u>Harlow v. Fitzgerald</u>, 102 S.Ct. 2727 (1982), the city itself is "strictly liable" for all constitutional violations committed pursuant to its policies.  See, e.g., <u>Pembaur v. City of Cincinatti</u>, 106 S.Ct. 1292, 1297 n.5, 1301-02 (1986) (applying retroactively <u>Steagald v. United States</u>, 101 S.Ct. 1642 (1981)).  Because policymakers cannot be said to be deliberately indifferent to constitutional rights that were not clearly established at the time they acted, the Gonzalezes assert that applying <u>Canton</u>'s heightened standard of fault in "policy" cases affords municipalities the same immunity withheld in <u>Owen</u>.

It is not clear that an embrace of <u>Canton</u> necessarily implies a rejection of <u>Owen</u>.  There are some indications that <u>Canton</u> requires a showing of deliberate indifference to citizens' constitutional rights, not merely the harm inflicted by city employees that gives rise to constitutional claims.  See <u>Canton</u>, 109 S.Ct. at 1205 (municipal liability may attach when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that

36

the policymakers of the city can reasonably be said to have been deliberately indifferent to the need"); id. at 1208 (O'Connor, J., concurring) ("Without some form of notice to the city, and the opportunity to conform to constitutional dictates both what it does and what it chooses not to do, the failure to train theory of liability could completely engulf Monell, imposing liability without regard to fault"). It therefore may well be, as several district courts have held, that "to be 'deliberately indifferent' to rights requires that those rights be clearly established." Watson v. Sexton, 755 F.Supp. 583, 588 (S.D.N.Y. 1991). Williamson v. City of Virginia Beach, 786 F.Supp. 1238, 1264-65 (E.D.Va 1992) ("[Even if] the constitutional rights alleged by plaintiff did exist, the conclusion that they were not clearly established negates the proposition that the city acted with deliberate indifference"), aff'd, 1993 U.S.App. Lexis 8421 (4th Cir. 1993); Zwalesky v. Manistee County, 749 F.Supp. 815, 820 (W.D.Mich. 1990).

Because the facts of this case do not directly implicate these questions, however, we need not resolve them. The arguments advanced by the Gonzalezes' most able counsel have taken us far afield and led us to treat the ultimate contours of a jurisprudence that remains unsettled. Needless to say, it is for the Court itself to address any perceived tension between Canton and its earlier decisions, see, e.g., Rodriquez de Quijas v. Shearson/ American Exp., Inc., 109 S.Ct. 1917 (1989), and nothing we have said should be taken as an indication that the principles established in these prior cases retain anything less than their

37

full force.  We do hold, however, that YISD may be held liable in this case only if the Board of Trustees' decision to transfer Mares to Jessica's elementary school manifested a deliberate indifference to the welfare of school children.

IV.

The trial court did not instruct the jury in accordance with this standard.  Rather than requiring the Gonzalezes to prove that the Board of Trustees' decision to keep Mares in the classroom manifested a deliberate indifference to students' constitutional right to bodily integrity, the district court advised the jury that YISD could be held liable if its policies "authorized, tolerated, or condoned sexual abuse of students by teachers."  Because these terms if anything provide for a higher standard of fault, we do not regard the trial court's omission of the deliberate indifference instruction as reversible error.  We hold, however, that the trial evidence is not sufficient to sustain the jury's verdict under either standard and therefore reverse and render judgment in favor of the school district.

A.

The district court submitted the following interrogatories to the jury:

> 1.   Do you find from a preponderance of the evidence that the Ysleta Independent School District, between January of 1985 and March of 1987, maintained a persistent, widespread custom or practice that authorized, tolerated, or condoned sexual abuse of students by teachers?
>
> 2.   Do you find from a preponderance of the evidence that the Ysleta Independent School District had, between January of 1985 and March of 1987, any formal policy,

38

statement, ordinance, regulation of decision that authorized, tolerated or condoned sexual abuse of students by teachers?

3.    Do you find from a preponderance of the evidence that either the persistent, widespread custom or practice, or the formal policy, statement, ordinance, regulation or decision of the defendant Ysleta Independent School District (whichever you found in Questions 1 and 2 existed between January of 1985 and March of 1987) proximately caused injury to Jessica Gonzalez?[12]

The jury answered both the second and third issue in the affirmative and thus returned a verdict in favor of the Gonzalezes.

YISD contends that the district court committed reversible error in refusing to advise the jury that liability could attach only if the Board's decision to keep Mares in the classroom reflected deliberate indifference to the rights of school children. We do not agree.  In light of our discussion in Part III, the district court clearly should have included a deliberate indifference instruction.[13]  The court did, however, inform the jury

---

[12]    Chief Judge Bunton's jury instructions on the issues of "policy" and "custom" closely tracked the formulations contained in the respective interrogatories.  He did elaborate, however, on the concept of proximate cause:

The term "proximate cause" means a cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause the act or omission complained of must be such that a person using ordinary care would have foreseen the event, or some similar event, might reasonably result therefrom.

[13]    The district court also should have instructed the jury that the school district could be held liable of if its policies were "the 'moving force [behind] the constitutional violation.'" Canton, 109 S.Ct. at 1205 (citing Polk County v. Dodson, 102 S.Ct. 445, 454 (1981); Monell, 436 U.S. at 694).  YISD did not object to the trial court's omission, however; it is consequently not before us on appeal.

that the Gonzalezes could recover only if the Board's policies or decisions "authorized, tolerated or condoned sexual abuse of students by teachers." Decisions that authorize, tolerate, or condone, like those reflecting deliberate indifference, are made with knowledge of the objectionable conduct; they all preclude a finding of liability on the basis of negligence, that is, on what the Board <u>should</u> have known. While courts must remain sensitive to the subtle distinctions among different degrees of "scienter," we cannot ignore the widespread, synonymous use of these terms in § 1983 cases. <u>See, e.g.</u>, <u>Canton</u>, 109 S.Ct. at 1209 (O'Connor, J., concurring) ("I think municipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations . . . . The lower courts that have applied the 'deliberate indifference' standard we adopt today have required a showing of a pattern of violations from which a kind of 'tacit authorization' by city policymakers can be inferred") (citing, <u>inter alia</u>, <u>Lanquirand v. Hayden</u>, 717 F.2d 220, 227-28 (5th Cir. 1983)); <u>Doe v. Taylor Independent School Dist.</u>, 975 F.2d 137, 149 (5th Cir. 1992) (jury could find that supervisors' nonfeasance "was not merely negligent, but grossly negligent, reckless, or deliberately (consciously) indifferent; that [their] toleration of Stroud's alleged misconduct for so long communicated their tacit condonation of his <u>mal</u> feasance"), <u>reh'q, en banc, granted</u>, 987 F.2d 231 (5th Cir. 1993); <u>Hicks v. Frey</u>, 1993 U.S. App. Lexis 11011, at *18-19 (6th Cir. 1993) ("The jury could have believed that Locke displayed

40

deliberate indifference to Hick's serious medical needs both by failing to address them herself and by implicitly authorizing, approving, or knowingly acquiescing in the unconstitutional conduct of others"); Angarita v. St. Louis County, 981 F.2d 1537, 1545 (8th Cir. 1992) (policymaker must have "known about and facilitated the conduct, approved it, condoned it, or turned a blind eye for fear of what others might see. In other words, he must have acted either knowingly or with deliberate, reckless indifference") (citation omitted); Jane Doe "A" v. Special School District, 901 F.2d 642, 646 (8th Cir. 1990) (plaintiff seeking to hold a municipality liable for inaction must prove "[d]eliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct"); Lipsett v. University of Puerto Rico, 864 F.2d 881, 902 (1st Cir. 1988) (supervisors may be held liable if their failure to act "could be characterized as supervisory encouragement, condonation, acquiescence or gross negligence amounting to deliberate indifference") (citation and quotation marks omitted); Jones v. City of Chicago, 856 F.2d 985, 992-93 (7th Cir. 1988) (defendants "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference"); Moore v. Winebrenner, 927 F.2d 1312, 1315 (4th Cir.) ("conduct may be characterized as 'deliberate indifference' or as 'tacit authorization'"), cert. denied, 112 S.Ct. 97 (1991); Clipper v.

41

<u>Takoma Park</u>, 876 F.2d 17, 20 (4th Cir. 1989) (city's omissions "actionable only if they constitute 'tacit authorization' or deliberate indifference to constitutional injuries").

Moreover, the school district itself appeared to equate the contended-for deliberate indifference instruction with the district court's formulation in requesting that the jury be asked to determine "whether there was <u>conscious indifference</u> to the rights of students to be free from sexual abuse that amounted to <u>condonation, toleration, or encouragement</u> of sexual abuse by teachers." (emphasis added). Because both of these instructions require the jury to find that the policymaker acted with knowledge of the likely consequences, we do not believe that the district court's omission would warrant a new trial. Proper instruction should of course refer to "deliberate indifference," but we are not prepared to hold on the facts of this case that Judge Bunton's charge constituted reversible error.

B.

The issue of jury instructions, however, is largely irrelevant in light of our review of the evidence, for we do not believe that the record supports a finding that the Board acted with deliberate indifference in failing to relieve Mares of his teaching duties. It is of course true that Mares would not have had the opportunity to assault Jessica had the Board removed him from the classroom after it learned of Leticia Peña's allegation in 1985. We also agree, and YISD appears to concede, that the Board's choice to transfer Mares rather than impose a more severe sanction was not

42

only negligent but also inconsistent with the district's handling of other cases of suspected sexual abuse. But these facts, by themselves, are not sufficient to establish that the Board was deliberately indifferent to the welfare of students in making its decision.

The Board did not ignore or turn a blind eye to the Peñas' complaint when it came to its attention. Instead, it immediately asked the district's superintendent and his deputy personally to investigate the incident and prepare a recommendation. The report Board members received found that the evidence was not strong enough to justify termination proceedings, but recommended that Mares be issued an official reprimand and a transfer out of Ascarate Elementary School. The Board's adoption of these precautions reflect not indifference or apathy, but concern. Rhyne, 973 F.2d at 393.

Nor can we understand how the inadequacy of these disciplinary measures could have been "obvious," see Canton, 109 S.Ct. at 1205, to the Board at the time of its decision. Board members were aware that two accusations, separated by four years, had been lodged against Mares. These allegations, while certainly a cause for concern, did not compare in gravity to Mares' conduct in 1987, and thus provided no grounds for suspecting that he might be capable of such a vile act. Moreover, the deputy superintendent, on whose factual findings the Board was surely entitled to rely, stated that he had virtually no proof that Mares touched Leticia Peña in the manner she initially reported. To hold that these facts support a

43

finding that the Board was "deliberately indifferent" would drain the term of its meaning. While sympathy for Jessica and her parents and anger toward those whose acts contributed to this tragic occurrence are understandable, our precedents do not permit us to hold the school district responsible for this harm.

V.

For the foregoing reasons, we REVERSE and RENDER judgment in favor of the Ysleta Independent School District.