United States Court of Appeals,

Fifth Circuit.

No. 95-20821.

Sherry SOUTHARD, et al., Plaintiffs,

Sherry Southard; Tammy Leis; Teresa Pankey; Helen Minter; Patricia Anne Maimbourg; Tammy Wells and Linda Fleming, Plaintiffs-Appellees,

v.

The TEXAS BOARD OF CRIMINAL JUSTICE, et al., Defendants,

James A. Collins, Director, Texas Department of Criminal Justice, Institutional Division, And Oscar Strain, Defendants-Appellants.

June 13, 1997.

Appeals from the United States District Court for the Southern District of Texas.

Before KING and PARKER, Circuit Judges, and ROSENTHAL[*], District Judge.

ROSENTHAL, District Judge:

Eight female correctional officers sued the former executive director of the Texas Department of Criminal Justice-Institutional Division ("TDCJ-ID") and a captain, asserting that the captain had sexually harassed them and subjected them to a hostile work environment. Three of the plaintiffs asserted Title VII claims against the TDCJ as well as 42 U.S.C. §§ 1983 and 1985(3) claims against the individual director and captain. Two plaintiffs tried their Title VII claims against the TDCJ to a jury;[1] the plaintiffs did not prevail. Asserting qualified immunity, the executive

---

[*]District Judge of the Southern District of Texas, sitting by designation.

[1]42 U.S.C. § 2000e et seq.

director moved for dismissal of all the section 1983 and 1985(3) claims; the captain filed similar motions as to two of the plaintiffs. The trial judge denied those motions.

The executive director and the captain appeal from the denial of their qualified immunity dispositive motions. This court reverses and remands for further proceedings consistent with this opinion.

## I. BACKGROUND

Oscar Strain began working for the TDCJ-ID as a correctional officer in the late 1970s and became a captain in July 1984. Strain worked in different TDCJ-ID units during the relevant period, including the Coffield Unit from July 1984 to August 1992, and the Michael Unit from August 1992 to February 1993. On March 1, 1993, Strain was transferred to the Robertson Unit. Beginning in 1991, female employees began to complain that Strain sexually harassed them.

Under TDCJ's employee grievance procedure, complaints alleging discriminatory conduct by TDCJ employees and officers are referred for investigation to the TDCJ internal Equal Employment Opportunity ("EEO") office. The TDCJ EEO office is staffed and functions independently of other TDCJ divisions. Complaints filed with the EEO office proceed according to the three-step process applicable to all TDCJ employee grievances. The first step is the submission of the grievance to the unit warden for review, attempted resolution, and response. The second step is an appeal to the regional director's office. The third and final step is an appeal

2

to the institutional division director's office.

In February 1991, Belinda Raines, a clerk at the Coffield Unit, filed a written grievance against Strain. In her grievance, Raines accused Strain of making sexually suggestive comments; addressing her with curses and profanities; and retaliating against her with a written reprimand when she complained. The EEO office investigated Raines's allegations of sexual harassment and issued a written report concluding that there was insufficient evidence to sustain them. The EEO office also found no evidence that the reprimand was motivated by retaliation.[2]

On March 15, 1991, Artis B. Mosely, Jr., the TDCJ-ID Assistant Director for Personnel and Training, forwarded a copy of Raines's EEO file to the office of James A. Collins, the executive director of TDCJ-ID. It is unclear whether Collins himself saw this complaint or the EEO report.[3]

On May 19, 1992, LaDonna Hull, a correctional officer in the Coffield Unit, filed a complaint against Strain with the unit warden, who referred it to TDCJ's EEO office. The EEO office investigated, interviewing five employees in addition to Hull and Strain. Hull told the EEO investigators that she had been in an

---

[2]The EEO investigation found that Strain wrote the reprimand on the same day that Raines went to the unit warden to complain about Strain. The report concluded that, because Raines did not return to work after she made her complaint to the warden, Strain could not have issued the reprimand after learning of Raines's complaint.

[3]The EEO investigation report was forwarded to Collins, but there is no signature or date stamp on the forwarding letter to reflect that either Collins or his office received the report or file.

3

intimate relationship with Strain from January to May 1992. Hull alleged that after she ended the relationship, Strain insisted on continuing to see her. Hull told the EEO investigators that at work, Strain sought her out; gave her personal notes; called her; threatened to retaliate against her superiors for assigning her to posts where his access to her would be limited; threatened to retaliate against coworkers if Hull associated with them; threatened to deny Hull's leave requests; and discussed sensitive information about inmates and employees with her.

The EEO office concluded that Hull's charges of sexual harassment could not be sustained because Hull and Strain both admitted to having a consensual sexual relationship; the decisions as to shift assignments and leave allowance were not made by Strain; and there was no evidence to support the allegations that Strain made threats. The EEO file on the Hull complaint included a written report from the warden of the Coffield Unit, stating that she had talked to Strain about his behavior but "could not make [Strain] understand the seriousness of his action." The EEO report concluded by noting that "[a]lthough the charge of sexual harassment could not be sustained, Captain Strain admitted to having a sexual relationship with one of his subordinates. Therefore, the potential for sexual harassment does exist."[4]

On June 29, 1992, Collins completed the third step of the grievance procedure on Hull's complaint. Collins signed a

_____

[4]Neither Belinda Raines nor LaDonna Hull filed a lawsuit and neither is a party to this case.

statement rejecting Hull's claim on the basis that a review showed insufficient evidence to support Hull's allegations. However, Collins wrote a note to the TDCJ-ID regional director, Wayne Scott, to "call me about this case."

In fall 1992, plaintiff Sherry Southard, a correctional officer at the Michael Unit, filed a written grievance against Strain that was referred to the EEO office. Southard asserted that beginning in September 1992, Strain harassed her and gave her instructions that violated TDCJ rules and procedures. Southard complained that when she refused to cooperate, Strain retaliated against her with unfavorable duty assignments.

In November 1992, the EEO office concluded that Southard's initial complaints were not of sexual harassment but rather of violations of security or unit procedures. The unit warden conducted an investigation, including interviews with two witnesses besides Southard and Strain, and found insufficient evidence to support Southard's allegations.

Southard continued to press her grievance. She supplied additional information, including specific details of alleged incidents of sexual harassment.[5] The EEO received similar

---

[5]Southard's allegations included the following: during a lunch break, Strain told her that "he was hungry" and that she had an obligation to take care of him; as Strain attempted to unlock a door for Southard, he said "I can't get it in"; Strain asked Southard personal questions and stated that he wanted to get to know her better; Strain talked to Southard about Strain's past marriages; Strain stared in a sexually suggestive manner; Strain made sexual statements to her; Strain asked Southard if she knew how to speak Spanish and, when she replied that "no" means the same in English and Spanish, Strain said that the word "no" never stopped him; Strain came up behind Southard and rubbed against

5

grievances from other employees and investigated the complaints alleging sexual harassment. During the investigation, EEO investigators interviewed sixteen employees besides Strain and Southard. The interviews resulted in verbal complaints against Strain from other employees. Theresa Pankey, a clerk at the Michael Unit, told the EEO investigators that in August 1992, Strain made a sexually suggestive comment to her.[6] Terri Wells, a former correctional officer at the Coffield Unit, told the investigators that in December 1984, Strain made a comment about her body.

The EEO office concluded that Southard's complaint of sexual harassment, and the complaints received from Pankey and Wells, were unsustainable. The EEO report analyzed each incident of inappropriate and harassing behavior that Southard alleged. The EEO report detailed the interviews of the witnesses to the acts of misconduct and the interviews of other possible victims. The EEO report concluded in part as follows:

> Ms. Southard and others have made several allegations concerning inappropriate comments, sexually suggestive looks, and offensive touching by Captain Strain. None of the

---

her; Strain attempted to maneuver her to isolated areas; after Southard failed to respond to Strain's advances, Strain called her several times to ask if she liked her job assignment, which Southard believed she had been given as punishment; and Strain gave her various work assignments and job instructions that violated TDCJ procedures and rules.

[6]Theresa Pankey claimed that on August 4, 1992, Strain talked to her about being his secretary, saying "I get what I want around here, and I want you"; that Strain slammed the door as he entered her office; and that on one occasion, Strain followed her from the copy room to her office in an intimidating manner. Pankey subsequently filed a written complaint with her warden.

allegations were supported by witness corroboration....

Normally conversations with co-workers about an incident shortly after it occurs could be used to strengthen the allegation that it had occurred. None of Ms. Southard's direct witnesses verified Ms. Southard's allegations. Steven Quick's reporting [that] he had been told by Ms. Southard of the October 11 incident is the only support provided by any of Ms. Southard's witnesses .... it is the opinion of this investigator that Officer Quick's objectivity should be questioned.

As has been stated throughout this report, Captains [sic] Strain's piercing glare/stare is a management tool he readily admitted to. He admitted using it in lieu of words.... Although his intent is not to intimidate it is the opinion of this investigator that it has had that effect.... The fact that Captain Strain uses a "look" with both men and women, is therefore, without question. However, whether a reasonable woman would have perceived the look to contain sexual implications is questioned.

Captain Strain's arrival on the Michael Unit was preceded by negative rumors which destroyed his opportunity to establish trust and respect from subordinates....

The EEO report summarized the negative rumors that had preceded Strain's arrival at the Michael unit. These rumors included that Strain was known as "Black Jesus" and known to "chase white women," and that he was a "nigger from Coffield who is fixin' [sic] to change things." Although the EEO report noted that its investigations did not normally consider a complainant's spouse, Dennis Southard had taken an unusually active role in encouraging his wife's complaint, and Dennis Southard had been disciplined at another unit for racial harassment. The EEO report stated that several women had been "approached by members of the union soliciting complaints about Strain," and that according to several supervisors, "there is a group of women who had historically been given the assignments they wanted.... Strain rotated the women to

7

positions they had not previously been required to work."

The EEO report summarized the basis of its conclusion:

> It is the opinion of this investigator there was apprehension on the Michael Unit anticipating Captain Strain's arrival. The CO's and their supervisors perpetuated negative rumors....This investigator believes that since sexual harassment was anticipated, every remark or mannerism which could have been interpreted sexually was, whether it should have been or not.

The EEO report concluded that there was "insufficient evidence to sustain a charge of sexual harassment, harassment or retaliation or malicious use of profane or abusive language." On March 15, 1993, Collins completed the third step of the grievance procedure by signing a statement affirming the EEO office's conclusion.

On November 24, 1992, Cathey Litton submitted a written grievance against Strain to the unit warden at the Michael Unit, who referred it to the EEO office. Litton, a correctional officer, alleged that in November 1992, Strain had "set her up" by ordering a cell search in which a letter believed to be written by Litton was found, resulting in an internal investigation for corresponding with an inmate; accused Litton of giving nude photos to an inmate; assigned Litton to undesirable duties as a tool of retaliation; and accused her of excessive absenteeism and required her to submit a written doctor's statement before returning to work. Litton alleged that Strain retaliated against her because he did not like her and because she had spoken to union representatives. In December 1992 and January 1993, the EEO office investigated Litton's complaint. During the investigation, the EEO investigators received a complaint from a former employee, Terrie

8

Taylor, that in 1984, Strain had made her do personal work and had made a negative comment about her body.[7]

The EEO report summarized the employee interviews and the documents reviewed in the investigation into the Litton grievance. The EEO office concluded that there was insufficient evidence to sustain Litton's charges of harassment and retaliation. The EEO report noted that Strain had denied Litton's allegations; interviews with other captains and a review of the shift rosters confirmed that the job assignments were made on a rotational basis; there were no witnesses or documentation to support Litton's other allegations; and Strain's requirement of a doctor's excuse for absences was justified by the fact that Litton often used sick days and vacation days consecutively. The EEO did not examine the allegations involving security issues, which were separately investigated by the TDCJ internal affairs division.

On March 15, 1993, Collins signed a statement that a review of the file established insufficient evidence to support Litton's allegations of retaliation and that Strain's requirement that Litton have a doctor's note for an absence was "within management's prerogative." However, Collins's signed statement acknowledged that the "reason or need" for the requirement of excuses for absentees was "unclear" and stated that Collins had asked the regional director to look into the issue of sick leave and

---

[7]Terri Taylor alleged that Strain had told her that she had a "large ass." Terri Taylor's complaint was included in the investigative file for Litton's complaint, but was not summarized in the EEO report.

9

physicians' statements. Collins also stated that he had "confirmed" that a written doctor's excuse would not be an ongoing requirement. The record contains an interoffice communication from Collins to Wayne Scott, the regional director, asking Scott to discuss the proof of absenteeism requirement at the next regional directors' meeting. The record also contains minutes from the directors' meeting, reflecting that the issue was discussed.

On December 8, 1992, plaintiff Tammy Leis, a correctional officer at the Michael Unit, filed a written grievance against Strain that was referred to the EEO office. Leis asserted that on December 5, 1992, she told Strain that she did not like working in a particular area because she feared for her safety and because she did not want to do Strain's paperwork any longer. Leis alleged that Strain responded by yelling profanities at her and blocking her path as she left the office. She also alleged that on previous occasions, Strain gave her personal material to type and made a sexually suggestive comment to her.[8] In December 1992 and January 1993, the EEO office investigated Leis' complaints, conducting interviews of five employees besides Leis and Strain. The EEO office concluded that there was insufficient evidence to sustain Leis' claim of sexual harassment. The EEO office found that there were "multiple inconsistencies" in Leis' version of the events; there were no corroborating witnesses to confirm a sexual nature to the conversations; the witnesses did not support Leis' description

---

[8]Leis alleged that Strain stated: "I've married a black and a white. You're dark complected, do you have Mexican in you? The next time I might try a Mexican."

10

of the December 5, 1992 exchange; and Leis' perceptions were affected by the rumors preceding Strain's arrival to the unit and by her concern about reactions from coworkers if she worked for Strain.

On March 29, 1993, the third step of the grievance procedure was completed. Collins signed a statement dismissing the complaint on the basis that the investigation showed insufficient evidence to sustain Leis' allegations.

On January 7, 1993, plaintiff Helen Minter, a correctional officer at the Michael Unit, filed a grievance against Strain that was forwarded to the EEO office. Minter complained that in August 1992, Strain assigned her to office duty because he "wanted [her] to be with him." Minter alleged that Strain made a sexual advance toward her and later refused to assign her to a particular job that she wanted. The EEO investigated and issued a report that summarized the employee interviews it had conducted. The EEO report concluded that Minter's allegations were unsustainable because there were no corroborating witnesses and no other supporting evidence. On May 7, 1993, the third step of the grievance procedure was completed, and Collins signed a statement affirming the EEO office's conclusion.[9]

On April 19, 1993, Carol Vance, the Chairman of the Board of the TDCJ, wrote a letter to Collins. The letter stated:

I received the enclosed letter from Mike Graham [a union representative for TDCJ employees]. If true, I think the

_____

[9]Collins initialed the draft version of the formal response.

11

> Abilene Warden should let the Captain know he is aware of past complaints. With such a history, we are also vulnerable to future lawsuits as well as, of course, wanting to discourage any female or other harassment at TDCJ.

The enclosed letter recounted that the author had heard sexual harassment complaints against Strain. In response, Collins wrote a note to Mosely, the Assistant Director of Personnel and Training, asking him to "call me on this." Mosely received the letter, with Collins's note, on April 25, 1993.

On April 29, 1993, Kristina L. Foster, a correctional officer at the Michael Unit, filed a grievance against Strain that was referred to the EEO office.[10] Foster alleged that in September and October 1992, Strain commented on her impending divorce and told her that a good wife takes care of her husband and does her "wifely duties." Foster also alleged that Strain had asked another coworker if Foster would be willing to date Strain. The EEO investigative report concluded that the allegation of harassment was unsustainable, because the coworker had not exactly corroborated Foster's allegations and there were no other corroborating witnesses. Collins initialed the forwarding letter accompanying the EEO report on August 3, 1993.

On May 5, 1993, plaintiff Patricia Maimbourg, a correctional officer at the Robertson Unit, filed a written complaint against Strain with the unit warden, who forwarded the complaint to the EEO office. In her complaint, Maimbourg asserted that beginning in March 1993, Strain had repeatedly brushed against her; had asked

---

[10]Kristina Foster did not file a lawsuit and is not a party to this proceeding.

her out on three occasions; called her at home for reasons unrelated to work; on two occasions asked her to come to his home; had told her that he "liked women of a lighter tan"; and asked her to do various personal tasks. The EEO office investigated the complaint in late May 1993. The EEO report summarized the complaint and the results of the witness interviews and concluded that Maimbourg's allegations were unsustainable. The EEO report noted that Maimbourg had previously complained to other officers that Strain had "hinted" that he wanted to go out with her, which was inconsistent with her later allegations. The report also noted that Maimbourg stated that she had heard rumors that Strain liked "blond white women" and that Maimbourg may have "based her perceptions on rumors" about Strain. The EEO office sent Collins a copy of Maimbourg's EEO report; Collins initialed the forwarding letter.

On July 22, 1993, Lori Palmer,[11] a correctional officer at the Robertson Unit, filed a grievance with the EEO office. Palmer complained that Strain told her she would be at his "beck and call," which Palmer interpreted to mean that Strain wanted her to do typing and other work. Palmer also complained that Strain changed her duty post and on one occasion told her to "waller [sic] on down" to the copier room, which Palmer interpreted as a negative reference to her weight.

During the EEO investigation into Palmer's complaint, the EEO

---

[11]Lori Palmer did not file a lawsuit and is not a party to this proceeding.

13

interviewer heard complaints from two other female employees at the Robertson Unit. Sugako Nunn, an administrative technician, complained that Strain had asked a coworker if Nunn was married; this had made Nunn nervous because she had been "forewarned" of Strain's liking for "blonde, white women." Nunn complained that Strain stared at her in a sexually suggestive manner; told her that she dressed provocatively; brushed against her inappropriately; and retaliated against her for rejecting his advances by calling her names and being uncooperative at work. Laura Toland, a clerk, complained that Strain looked at her in a sexually suggestive manner.

In its investigative report, the EEO office sustained the allegations that Strain had stared at some females in a sexually suggestive manner. However, the EEO report did not find sufficient evidence to sustain complaints of sexual harassment. The EEO report summarized the employee interviews and stated that rumors preceding Strain's arrival at the Robertson Unit had "created a heightened sense of concern on the part of the complainants." Collins initialed the forwarding letter accompanying the EEO report.

On April 26, 1993, plaintiff Linda Fleming, a correctional officer at the Robertson Unit, filed a grievance against Strain with the EEO office, alleging age discrimination. In her complaint, Fleming asserted that Strain assigned younger women to the "better jobs," such as desk and utility, while placing older women in the "pickets," and alleged that Strain had retaliated

14

against her by requiring her to bring in a doctor's excuse for sick leave. The EEO office investigated the complaint in May 1993 and determined that the lack of supporting witnesses and the shift rosters, which showed that the assignments were rotated, prevented a finding of age discrimination. The EEO report also noted that Fleming took a large amount of sick leave in April 1993 and that there was no basis for finding the requirement of a doctor's excuse retaliatory. The EEO report also noted that Fleming had heard that Strain had a "preference" for "young white women" before she made her complaint, leading to an "environment conducive to the manifestation of discriminatory perceptions." Collins initialed the forwarding letter accompanying the EEO report.

On February 4, 1994, plaintiff Sherry Southard filed suit in the United States District Court for the Southern District of Texas against the TDCJ, Collins, and Strain.[12] Southard alleged that Strain subjected her to sexual harassment and to a hostile work environment, in violation of Title VII (as to the TDCJ) and sections 1983 and 1985(3) (as to Strain and Collins). Correctional officers Tammy Leis and Cathey Litton also sued Strain, Collins, and the TDCJ, asserting similar claims. Plaintiffs Helen Minter, Theresa Pankey, Patricia Maimbourg, Tammy Wells, and Linda Fleming also filed suits against Collins and Strain under 42 U.S.C. §§ 1983 and 1985(3). These suits were consolidated into Southard's action.

On July 21, 1994, the parties consented to proceed before

---

[12]*Southard, et al. v. Texas Board Criminal Justice, et al.,* 94-CV-0396.

15

United States Magistrate Judge Calvin Botley. In mid-1995, the trial court severed Leis', Litton's, and Southard's Title VII claims against the TDCJ from the section 1983 and 1985(3) claims they asserted against the individual defendants. On September 26, 1995, Southard and Leis tried their Title VII claims against the TDCJ.[13] The jury returned a verdict in the TDCJ's favor.

Collins filed a motion to dismiss or, alternatively, for summary judgment, as to the section 1983 and 1985(3) claims against him. Collins argued that the section 1983 and 1985(3) claims were preempted by Title VII, and, alternatively, that as a matter of law, he was entitled to qualified immunity against the supervisory liability claims. The trial court denied Collins's motion. Strain also filed motions to dismiss or, alternatively, for summary judgment, but only as to the claims asserted against him by Teresa Pankey and Linda Fleming. Strain asserted that he was entitled to qualified immunity because the facts alleged failed to state violations of clearly established constitutional rights. The court denied those motions.

Collins appeals the district court's denial of his motion to dismiss or, alternatively, for summary judgment, against all appellees. Strain appeals the district court's denial of his motion for summary judgment against two of the appellees. These are interlocutory appeals, affecting only pieces of this quilted-together litigation, based on the denial of the individual defendants' qualified immunity motions. This court's review is

_____

[13]Litton nonsuited her Title VII claims before trial.

16

accordingly limited.

## II. STANDARD OF REVIEW

This court reviews *de novo* the denial of a public official's motion for summary judgment predicated on qualified immunity. *Johnston v. City of Houston, Tx.,* 14 F.3d 1056, 1059 (5th Cir.1994).

## III. DISCUSSION

A. JURISDICTION

In this interlocutory appeal, the first issue is whether the trial court's denials of the motions for summary judgment based on qualified immunity are immediately appealable orders. In *Mitchell v. Forsyth,*[14] the Supreme Court held that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable "final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment."[15] The Court allowed an interlocutory appeal in *Mitchell* because "the issue appealed concerned, not which fact the parties might be able to prove, but rather, whether or not certain given facts showed a violation of "clearly established' law."[16]

In *Johnson v. Jones,*[17] the Supreme Court held that a district court's determination that the summary judgment record in a qualified immunity case raised a genuine issue of fact was not

---

[14]472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

[15]*Id.* at 530, 105 S.Ct. at 2817-18, 86 L.Ed.2d at 427-28.

[16]*Id.*

[17]--- U.S. ----, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995).

17

immediately appealable, because it rested on a question of "evidence sufficiency."[18] The Supreme Court has since clarified that *Johnson* "permits [a defendant] to claim on appeal that all of the conduct which the District Court deemed sufficiently supported for purposes of summary judgment met the *Harlow [v. Fitzgerald* ][19] standard of "objective legal reasonableness.' "[20] In *Behrens v. Pelletier,* the Supreme Court held that the district court's determination that "[m]aterial issues of fact remain" did not preclude appellate review.[21] A court cannot review whether the evidence "could support a finding that particular conduct occurred,"[22] but can "take, as given, the facts that the district court assumed when it denied summary judgment" and determine whether those facts state a claim under clearly established law. *Cantu v. Rocha,* 77 F.3d 795, 803 (5th Cir.1996); *Nerren v. Livingston Police Dept.,* 86 F.3d 469, 472 (5th Cir.1996).

In this case, this court has interlocutory jurisdiction to determine whether appellees' summary judgment facts, taken as given, state a claim against Collins and Strain under clearly established law. "Taking the plaintiffs' allegations as true," this court can decide whether the defendants are entitled to

_____

[18]*Id.*

[19]457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

[20]*Behrens v. Pelletier,* --- U.S. ----, ----, 116 S.Ct. 834, 842, 133 L.Ed.2d 773 (1996).

[21]*Id.*

[22]*Id.*

18

qualified immunity. *Cantu,* 77 F.3d at 805.

B. THE INTERSECTION OF 42 U.S.C. § 1983 AND TITLE VII

Collins contends that the claims under 42 U.S.C. §§ 1983 and 1983(5) are precluded because Title VII provides the exclusive remedy in this federal employment discrimination suit. Collins asserts that the trial judge erred as a matter of law in allowing plaintiffs to assert both Title VII and section 1983 claims, based on the same underlying facts. *Jackson v. City of Atlanta, Tx.,* 73 F.3d 60, 62 (5th Cir.), *cert. denied,* --- U.S. ----, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996).

In *Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565, 1573 (5th Cir.1989), *cert. denied,* 493 U.S. 1019, 110 S.Ct. 718, 107 L.Ed.2d 738 (1990), this court carefully analyzed the relationship between Title VII and section 1983. Johnston, a former county employee, was terminated after he testified in support of a coworker's discrimination allegations at an Equal Employment Opportunity hearing. Johnston sued the flood control district and its individual directors for retaliation, alleging violations of Title VII and section 1983. Following a trial, the district court found the flood control district liable under both Title VII and section 1983.

On appeal, this court rejected as "incomplete," and therefore inaccurate, the defendant's argument that Title VII preempted a section 1983 claim arising from the same facts. Judge Gee, writing for the court, explained the relationship between the two statutes:

> Title VII is the exclusive remedy for a violation of its own terms, [but] when a public employer's conduct violates both

19

> Title VII and a separate constitutional or statutory right, the injured employee may pursue a remedy under § 1983 as well as under Title VII.

*Johnston,* 869 F.2d at 1573.

In *Johnston,* the defendant's conduct violated Title VII and violated the constitutional right to be free to testify without retaliation. "Because the predicate for [plaintiff's] § 1983 claim was a right independent of the right Title VII creates, Johnston was entitled to pursue remedies under both statutes." *Id.* The court based this holding on a thorough analysis of the prior case law arising under Title VII, including *Irby v. Sullivan,* 737 F.2d 1418 (5th Cir.1984), holding that Title VII is the exclusive remedy for a violation of its own terms; and of the legislative history of Title VII, revealing that " "the remedies ... under Title VII are co-extensive with the individual's right to sue under the provisions of the Civil Rights Act of 1866 ... [and] the two procedures augment each other and are not mutually exclusive.' " *Johnston,* 869 F.2d at 1576. The court concluded:

> Although Title VII supplements and overlaps § 1983, it remains an exclusive remedy when a state or local employer violates only Title VII. When, however, unlawful employment practices encroach, not only on rights created by Title VII, but also on rights that are independent of Title VII, Title VII ceases to be exclusive. At this point, § 1983 and Title VII overlap, providing supplemental remedies.

*Id.*

Collins cites *Jackson v. City of Atlanta, Tx.,* 73 F.3d 60 (5th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996), in which the plaintiff sued his employer, a city, the city manager, and several council members individually, asserting

20

employment discrimination based on race. Plaintiff alleged violations of Title VII and section 1983 based on the same allegedly discriminatory acts. In dismissing the section 1983 claim, this court recognized that under *Johnston v. Harris County Flood Control Dist.,* a plaintiff may pursue both section 1983 and Title VII claims when the employer's conduct violates both Title VII and a separate constitutional or statutory right. However, because the plaintiff in *Jackson* used the same facts to pursue claims under both Title VII and section 1983, this court found that he was precluded from suing under both statutes. *Id.* at 63.

In *Jackson,* the court emphasized that plaintiffs alleged the same conduct to support a claim under both statutes. 73 F.3d at 61. However, in *Johnston v. Harris County Flood Control Dist.,* the plaintiff's claims under both Title VII and section 1983 were also based on identical facts and identical allegations. In *Johnston,* this court found that because the allegedly discriminatory conduct violated rights under Title VII and rights independent of Title VII, the same facts created claims under both remedies. *Jackson* is inconsistent with *Johnston,* and *Johnston,* as the earlier opinion, controls our decision in this case.[23]

The *Johnston* result is consistent with that reached by other circuits considering the question. These courts have found that a public sector employee may assert claims of racially discriminatory

---

[23]*See, e.g., Smith v. Penrod Drilling Corp.,* 960 F.2d 456, 459 n. 2 (5th Cir.1992); *United States v. Fields,* 923 F.2d 358, 360 n. 4 (5th Cir.), *cert. denied,* 500 U.S. 937, 111 S.Ct. 2066, 114 L.Ed.2d 470 (1991).

employment practices under both Title VII and section 1983, because the Constitution provides a right independent of Title VII to be free from race discrimination by a public employer. *See, e.g., Bradley v. Pittsburgh Bd. of Educ.,* 913 F.2d 1064, 1079 (3d Cir.1990); *Roberts v. College of the Desert,* 870 F.2d 1411, 1415 (9th Cir.1988); *Brown v. Hartshorne Pub. School Dist. No. 1,* 864 F.2d 680, 683 (10th Cir.1988); *Keller v. Prince George's County,* 827 F.2d 952, 962 (4th Cir.1987); *Trigg v. Fort Wayne Community Schools,* 766 F.2d 299, 302 (7th Cir.1985); *Grano v. Department of Dev.,* 637 F.2d 1073, 1082 (6th Cir.1980).

In this case, plaintiffs alleged sexual harassment and sex discrimination by their public employer. Sex discrimination and sexual harassment in public employment violate the Equal Protection Clause of the Fourteenth Amendment. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986); *Davis v. Passman,* 442 U.S. 228, 234-35, 99 S.Ct. 2264, 2271, 60 L.Ed.2d 846 (1979); *Pontarelli v. Stone,* 930 F.2d 104, 114 (1st Cir.1991) (sexual harassment is a deprivation of equal protection and is actionable under 42 U.S.C. § 1983). The circuits addressing the issue have allowed plaintiffs suing their public employers for sexual harassment and sex discrimination to assert claims under both Title VII and section 1983. *See, e.g., Cross v. State of Alabama,* 49 F.3d 1490, 1503 (11th Cir.1995) (a state employee may sue for sexual harassment under section 1983); *Noland v. McAdoo,* 39 F.3d 269, 271 (10th Cir.1994) (a supervisor who exercised state authority over an employee may be liable for sexual

22

harassment under section 1983); *Beardsley v. Webb,* 30 F.3d 524, 527 (4th Cir.1994) (a public sector employee may sue under both Title VII and section 1983 for sexual harassment); *Gierlinger v. New York State Police,* 15 F.3d 32, 34 (2d Cir.1994) (sexual harassment and sex discrimination claims can be brought under both section 1983 and Title VII); *Bartunek v. Bubak,* 941 F.2d 726, 727 (8th Cir.1991) (the plaintiffs were permitted to sue their public sector employer for sexual harassment under section 1983); *Bouman v. Block,* 940 F.2d 1211 (9th Cir.), *cert. denied,* 502 U.S. 1005, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991) (section 1983 and Title VII sex discrimination claims can be brought in a single action); *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1480 (3d Cir.1990) (sexual harassment violates a constitutional right); *Volk v. Coler,* 845 F.2d 1422, 1431 (7th Cir.1988) (a hostile work environment violates a constitutional right).[24]

Plaintiffs' allegations of sex discrimination and sexual misconduct assert claims under sections 1983 and 1985(3) that are not preempted by Title VII.

C. QUALIFIED IMMUNITY

To determine whether qualified immunity applies, a court must first determine whether the plaintiff has asserted a violation of a constitutional right. *Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). This determination is

---

[24]One district court has held that Title VII is the exclusive remedy for sexual harassment and preempts plaintiffs from filing under § 1983. *Marrero-Rivera v. Dept. of Justice,* 800 F.Supp. 1024 (D.P.R.1992).

made using currently applicable constitutional standards. *Nerren v. Livingston Police Department,* 86 F.3d at 473. If so, the court must then decide if the defendant's conduct was objectively reasonable, using the standards applicable at the time the events occurred. *Id; Johnston v. City of Houston,* 14 F.3d at 1059. If, upon viewing the evidence in the light most favorable to the nonmovant, reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987), *citing Pfannstiel v. City of Marion,* 918 F.2d 1178, 1183 (5th Cir.1990).

*1. James A. Collins*

A supervisor cannot be held liable under section 1983 on the basis of *respondeat superior. Monell v. Dept. of Social Services,* 436 U.S. 658, 694 n. 58, 98 S.Ct. 2018, 2037, n. 58, 56 L.Ed.2d 611 (1978). Rather, the misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor. In *Doe v. Taylor Independent School District,* 15 F.3d 443, 453 (5th Cir.1994)(en banc), *cert. denied sub nom, Lankford v. Doe,* 513 U.S. 815, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994), this court noted the close relationship between the elements of municipal liability and an individual supervisor's liability:

> The legal elements of an individual's supervisory liability
> and a political subdivision's liability, however, are similar
> enough that the same standards of fault and causation should
> govern. A municipality, with its broad obligation to
> supervise all of its employees, is liable under § 1983 if it
> supervises its employees in a manner that manifests deliberate
> indifference to the constitutional rights of citizens. We see
> no principled reason why an individual to whom the

24

> municipality has delegated responsibility to directly supervise the employee should not be held liable under the same standard.

15 F.3d at 453. The court concluded that a supervisory official may be liable under section 1983 if that official, by action or inaction, demonstrates a deliberate indifference to his or her constitutionally protected rights. *Id.* at 454.

Although the deliberate indifference standard arose from a case alleging a violation of a substantive due process right, the standard applies to other underlying constitutional violations as well. *Id.,* n. 8. The Supreme Court has recently reaffirmed that " "deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of the County Commissioners of Bryan County, Oklahoma, v. Brown,* --- U.S. ----, ----, 117 S.Ct. 1382, 1391, --- L.Ed.2d ---- (1997);[25] *see also, Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994)(deliberate indifference is more than "more blameworthy than negligence", but less than "acts or omissions for the very purpose of causing harm or with knowledge that harm will result"). The "deliberate indifference" standard permits courts to separate omissions that "amount to an intentional choice" from

---

[25]In *Board of the County Commissioners of Bryan County, Oklahoma, v. Brown,* the Court held that Bryan County was not liable for the sheriff's isolated decision to hire his nephew as a deputy, without adequately reviewing his background, because the plaintiff did not demonstrate that the sheriff's decision reflected a conscious disregard for a high risk that the nephew would use excessive force in violation of federally protected rights. --- U.S. ----, ----, 117 S.Ct. 1382, 1391, --- L.Ed.2d ---- (1997).

those that are merely "unintentionally negligent oversight[s]." *Gonzalez v. Ysleta Independent School District,* 996 F.2d 745, 756 (5th Cir.1993), *quoting Rhyne v. Henderson County,* 973 F.2d 386, 392 (5th Cir.1992).

Appellees assert that because Collins knew of the numerous, similar complaints of sexual harassment against Strain, and failed to stop the harassment, Collins was deliberately indifferent to appellees' constitutional rights. Collins asserts that his receipt of the EEO investigative reports cannot as a matter of law show that he acted with deliberate indifference to appellees' rights, because the EEO office conducted independent investigations and concluded that none of the complaints was sustainable.

In *Doe v. Taylor Independent School District,* this court considered whether a high school principal and superintendent of schools were shielded by qualified immunity from the claims of a high school student who had been sexually molested by a teacher. This court found that the school principal did not have qualified immunity for his failure to supervise the teacher, resulting in the child's molestation. However, the superintendent of schools was immune.

When the superintendent heard of the teacher's potential misconduct, he instructed the principal, the teacher's direct supervisor, to speak to the teacher. Several months later, the superintendent was informed that the teacher had given alcohol to students at an event and behaved inappropriately with Doe. The superintendent contacted the parents of one of the allegedly

26

misbehaving students to discuss the report and was assured that their child had not even attended the event. After intimately inscribed photographs came to light, Doe's parents arranged to meet with the superintendent. At that meeting, the superintendent acknowledged his awareness of the rumors about the teacher and Doe; talked to Doe; and warned the teacher to stay away from Doe. The court concluded that the superintendent had notice of a pattern of inappropriate sexual behavior. However, the superintendent was not deliberately indifferent to that knowledge. He took some steps: instructing the principal to talk to the teacher; checking on an incident reported to him; and, later meeting with the principal and teacher. "His actions were ineffective, but not deliberately indifferent." 15 F.3d at 458.

Collins served as the director of the TDCJ-ID from January 1990 to April 1994. As director, Collins oversaw 108 prison units and approximately 38,000 employees. Each prison unit organizes the line of authority over its security personnel after a military chain of command: wardens, assistant wardens, majors, captains, lieutenants, sergeants, and correctional officers, in descending hierarchical order. Each level of subordinate employee reports to the next level up the chain of command. As director, Collins had in place a written, formal system to receive and investigate employee complaints of discrimination and harassment based on sex and a written policy against such discrimination and harassment.[26]

---

[26]The relevant Executive Directive provides:

It is the policy of the Texas Department of Criminal

27

Collins asserts in his affidavit that he did not personally see the plaintiffs' EEO complaints, but rather that his office staff would review the complaints for him. Because this court has jurisdiction only to review the questions of law posed by the district court's denial of summary judgment based on the defense of qualified immunity, this court will "ignore the disputes of fact, take those facts assumed by the district court in a light most favorable to [plaintiffs], and determine whether those facts" establish an exception to the qualified immunity defense. *Nerren,* 86 F.3d at 472; *Cantu,* 77 F.3d at 805. In that light, the record discloses that Collins received the EEO office investigative reports into the complaints made by Hull, Southard, Pankey, Litton, Leis, Minter, Foster, Maimbourg, Nunn, Toland, Palmer, and Fleming. Collins initialed the forwarding letters for the EEO's reports into the complaints filed by Maimbourg, Palmer, Foster, and Fleming, and signed the formal response for the third stage of the grievance process, rejecting the complaints filed by Hull, Southard, Litton, Leis, and Minter. Like the superintendent in *Doe,* Collins was aware of the complaints of inappropriate behavior. Collins also knew that the EEO office investigated each complaint and found it lacking. The issue is whether Collins's knowledge of the allegations and of the EEO's investigation reports rejecting those allegations creates a fact issue as to deliberate indifference.

> Justice, that all employees should enjoy a working environment free from all forms of discrimination, including sexual harassment.... The Agency will treat sexual harassment as any other form of employee misconduct—it shall not be tolerated.

28

In *Gonzalez v. Ysleta Independent School Dist.,* 996 F.2d 745 (5th Cir.1993),[27] this court found that a school district board of trustees was immune from liability for a teacher's molestation of a student. *Id.* at 762. When the board was informed of two incidents of the teacher's inappropriate behavior, the board transferred the teacher. After the transfer, the teacher molested a first grader. *Id.* at 746-49. This court determined that the board of trustees had not acted with deliberate indifference in failing to terminate the teacher after the first two complaints, because, although the board's decision to transfer was "negligent" and "inconsistent with the district's handling of other cases of suspected sexual abuse," the board had not turned "a blind eye" to the complaints, but had ordered an investigation and followed the recommendation based on that investigation. *Id.* In this case, Collins knew that the EEO office independently investigated each complaint and he followed the conclusions of the EEO office.

Plaintiffs rely on *Gutierrez-Rodriguez v. Cartagena,* 882 F.2d 553 (1st Cir.1989), to argue that there is a triable issue as to whether Collins knew that the EEO investigations were wholly inadequate. In *Cartagena,* a group of police officers from the narcotics division of the Puerto Rico police department shot the plaintiff. The plaintiff sued the police officers, the director of

---

[27]*See also, John Doe v. Hillsboro Independent School Dist.,* No. 94-50709, --- F.3d ---- (5th Cir. May 27, 1997) (en banc) (holding that school superintendents and trustees were not liable under section 1983 where the plaintiff could not demonstrate a nexus between a failure to check the criminal background of a school employee and the sexual assault of a student).

the narcotics division, and the superintendent of police, under section 1983. The superintendent relied on internal investigations rejecting use of force and other complaints against the officers, and asserted immunity. The First Circuit upheld the jury's verdict against the police superintendent because a reasonable jury could have found callous indifference to the plaintiff's rights. The court found that the investigations on which the superintendent relied in deciding not to take action against the police officer, despite a large number of similar complaints, had "glaring inadequacies." Officers who were the subject of an internal investigation could refuse to testify or give a statement to investigating officers; witnesses had to come to the station house to give sworn written statements; when a citizen withdrew his complaint, the internal investigation ended, which caused officers to intimidate witnesses; and immediate supervisors were not involved. *Id.* at 565-66. Based on these findings, the court concluded that:

> [b]oth [the] failure to identify and take remedial action concerning [the officer] and his employment of a disciplinary system that was grossly deficient in a number of significant areas made it highly likely that the police officers under his command would engage in conduct that would deprive the citizens of Puerto Rico of their constitutional rights.

*Id.* at 566.

In this case, by contrast, the record does not disclose that the TDCJ EEO office procedures, as implemented in the reports provided to Collins, showed the same systemic "glaring inadequacies" that made the counterpart in *Gutierrez-Rodriguez* a source of supervisory liability rather than a qualified immunity

30

shield.[28]

In *Gutierrez-Rodriguez,* the investigative process was an integral part of the police department. In this case, by contrast, the EEO office was independent of other TDCJ departments. The grievance process required the accused officer to respond to the complaints, allowed witnesses to give information through informal interviews, and actively involved supervisors. The grievance procedures encouraged employees to give interviews and statements to investigators; provided that an employee's service as a witness was "official business," for which the employee was to be released on paid time during working hours; and provided protection against reprisals for such service.

The EEO investigative reports that Collins received bore the earmarks of a detailed investigation. The reports contained detailed summaries of each employee's allegations against Strain, providing specific information on the dates and circumstances of the alleged harassment and retaliation. The reports listed the

_____

[28]Plaintiffs submitted the report of an expert witness who found the EEO investigative procedure to be "seriously and fundamentally flawed." The expert witness, a lawyer with experience in employment discrimination cases, concluded that the TDCJ EEO office investigative procedures had systemic flaws. However, the expert's criticisms of the TDCJ EEO office investigative procedure do not approach the "glaring inadequacies" that characterized the internal investigation procedures used in *Cartagena.* The lawyer's report provides an insufficient basis for an inference that Collins subjectively knew that the EEO office investigation procedure as applied to the complaints against Strain was so flawed that he could not reasonably rely upon the EEO office's conclusions. The record does not permit a conclusion by this court that by relying on the EEO office investigation and conclusions that the allegations of sexual harassment against Strain could not be sustained, Collins was deliberately indifferent to the rights of his employees to be free from such harassment.

witnesses interviewed;[29] the results of those interviews; and the contents of documents and records reviewed. Each report explained why, although some of the allegations made by some of the grievants were supported, the EEO office rejected the allegations of sexual harassment and retaliation. The reports did not hide the fact that Strain had received a number of similar complaints from female correctional officers and clerks. Instead, the reports explained why, despite the number of complaints, the EEO was unable to sustain the allegations.

Moreover, unlike the police chief in *Cartagena,* and like the superintendent in *Doe v. Taylor Independent School District,* Collins did not simply ignore the complaints and dismiss the charges. Instead, Collins took some steps, asking the regional director and the director of personnel to investigate some questions raised by the EEO investigation reports. Even if those steps were "ineffectual," they do not demonstrate deliberate indifference.

The evidence does not raise a fact issue that Collins subjectively knew Strain was sexually harassing female employees or knew that the EEO office's procedures for investigation into such complaints were "glaringly inadequate." Collins did not act with deliberate indifference to plaintiffs' federally protected rights. He is entitled to qualified immunity.

---

[29]While the reports generally included a complete list of witnesses, the EEO investigation report of the investigation into Litton's complaint omitted the complaint alleged by Terri Taylor, which was contained in the EEO investigative file.

32

*2. Oscar Strain and Linda Fleming*

Strain contends that as a matter of law, he is entitled to qualified immunity against Linda Fleming's claims. Fleming did not allege acts of sexual harassment. Instead, in her EEO grievance and her pleadings, she alleged that Strain gave her less favorable work assignments because of a personal "animus" toward women and because Fleming filed an age discrimination complaint against TDCJ. Fleming alleged that Strain selected another officer for the position of "grievance officer"; assigned Fleming to run three gates simultaneously on several occasions; assigned Fleming library duty; reprimanded Fleming within the hearing of inmates; and on one occasion refused to allow her to have a water bottle at her duty station.

To state a claim of sex discrimination under section 1983, a plaintiff must show the following elements: 1) membership in a protected class; 2) that the plaintiff was qualified for the position at issue; 3) that the defendant made an adverse employment decision despite the plaintiff's qualifications; and 4) that the plaintiff was replaced with a person not a member of the protected class. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Cervantez v. Bexar County Civil Service Commission,* 99 F.3d 730, 734 (5th Cir.1996)("we have on numerous occasions recognized that section 1983 and Title VII are parallel causes of action"); *Wallace v. Texas Tech. University,* 80 F.3d 1042, 1047 (5th Cir.1996) (applying the same *prima facie* test to discrimination claims under Title VII

33

and section 1983); *Merwine v. Board of Trustees for State Institutions of Higher Learning,* 754 F.2d 631, 635, n. 3 (5th Cir.1985) ("[w]hen a § 1983 claim is used as a parallel to a Title VII claim under a given set of facts, the elements required to be established for each claim are deemed the same under both statutes").

To assert a cause of action for retaliation for the exercise of a federally protected right, a plaintiff must show that she:

1) engaged in a protected activity;

2) an adverse employment action followed;  and

3) there was a causal connection between the activity and the adverse action.

*Mattern v. Eastman Kodak, Co.,* 104 F.3d 702, 705 (5th Cir.1997); *Harrington v. Harris,* 108 F.3d 598, 603 (5th Cir.1997) (a plaintiff must show that he suffered an adverse employment action to state a retaliation claim under section 1983); *Pierce v. Texas Department of Criminal Justice,* 37 F.3d 1146, 1150 n. 1 (5th Cir.1994) ("[m]ore than a trivial act of retaliation [is required] to establish constitutional harm" in a 1983 case).

Strain contends that he is entitled to qualified immunity because Fleming failed to raise a fact issue that Strain's conduct, objectively viewed, violated her clearly established rights. Strain supervised Fleming for approximately three and one-half months.  Fleming testified in her deposition that none of the work assignments Strain gave her was more difficult or burdensome than the jobs she would have preferred;  she enjoyed the library assignment;  none of the jobs were very difficult;  she was rotated

34

among a number of jobs and did not know where other employees were assigned; and that the only reason she complained about any of the assignments was her belief that Strain was retaliating against her.

Not every negative employment decision or event is an adverse employment action that can give rise to a discrimination or retaliation cause of action under section 1983. *Harrington,* 108 F.3d at 604; *Pierce,* 37 F.3d at 1149. Adverse employment actions include discharges, demotions, refusals to hire, refusals to promote, and reprimands. *Id.; see also Dollis v. Rubin,* 77 F.3d 777, 781-82 (5th Cir.1995). Undesirable work assignments are not adverse employment actions. *Harrington,* 108 F.3d at 604, *citing Dorsett v. Bd. of Trustees for State Colleges & Universities,* 940 F.2d 121, 123 (5th Cir.1991).

Fleming's allegations and summary judgment proof do not raise a fact issue that Strain's supervision, objectively viewed, clearly violated her federally protected rights. As a matter of law, Strain is entitled to qualified immunity as to Fleming's claims under sections 1983 and 1985(3).

*3. Oscar Strain and Teresa Pankey*

Theresa Pankey alleged and provided summary judgment evidence that Strain slammed the door when he came into her office, which made her feel "uncomfortable"; Strain stared at her before asking her to do a typing job that she felt she should not have to do; Strain told her that she might be his personal secretary, and when Pankey responded that she was not aware of such plans, Strain said, "[l]et me tell you something. I get what I want around here, and

35

I want you." On another occasion, Pankey was in the copy room when Strain came in, closed the door, and asked her why she was "mad at him." Strain followed Pankey back to their office and was about to slam the door when Pankey received a phone call. Later that day, Strain came into her office and slammed the door so that Pankey and another female employee were alone with Strain. Pankey told Strain to open the door; another officer came in and Strain left.

Pankey alleged in her second amended complaint that Strain told her in a "threatening, provocative manner she had to work with him" and gave her "unreasonable work assignments." According to Pankey, Strain's requests for typing were "unreasonable work assignments," because Strain would ask her to drop her other work to type for him. In her deposition, Pankey testified that when she would inform Strain that she could not do the work immediately, Strain would ask if she could do it later.

Strain asserts that Pankey's allegations and evidence fail to raise a fact issue defeating qualified immunity, because Pankey has not shown that the acts she complains about were based on her sex, *Ellert v. University of Texas, at Dallas,* 52 F.3d 543, 545 (5th Cir.1995), or that the conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *Farpella-Crosby v. Horizon Health Care,* 97 F.3d 803, 806 (5th Cir.1996); *DeAngelis v. El Paso Mun. Police Officers Assn.,* 51 F.3d 591, 594 (5th Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 473, 133 L.Ed.2d 403 (1995).

Pankey admitted that her job required her to type documents

36

for the ranking officers, and that Strain's door slamming and stares were directed toward men as well as women. Pankey's subjective interpretation of Strain's comments is insufficient to raise a fact issue as to sexual harassment. *See Burns-Toole v. Byrne,* 11 F.3d 1270, 1274 (5th Cir.), *cert. denied,* 512 U.S. 1207, 114 S.Ct. 2680, 129 L.Ed.2d 814 (1994)("[a plaintiff] cannot prevail [over the defense of qualified immunity] with mere conclusory statements evidencing only a personal belief that the defendants were motivated by an impermissible animus"). Even assuming that Strain's comments and conduct were motivated by Pankey's sex, they were not so severe or pervasive as to constitute sexual harassment. *DeAngelis,* 51 F.3d at 594.

Strain has qualified immunity as to Pankey's claims against him under section 1983 and section 1985(3).[30]

## IV. CONCLUSION

For the reasons stated above, we REVERSE the district court's order denying qualified immunity to defendant Collins as to all plaintiffs, and to defendant Strain as to the claims of plaintiffs Fleming and Pankey. This case is REMANDED for further proceedings on the remaining plaintiffs' claims against Strain.

---

[30]Because Pankey failed to state a constitutional violation, her section 1985(3) claim fails as a matter of law.